# United States Court of Appeals
## For the First Circuit

No. 02-1818

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE A. VÁZQUEZ-RIVERA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Torruella, Circuit Judge,
Porfilio,* Senior Circuit Judge,
and Howard, Circuit Judge.

Edward J. DeAngelo, was on brief, for appellant.
Sonia I. Torres-Pabón, Assistant United States Attorney,
Chief, Criminal Division, with whom H.S. García, United States
Attorney, and Germán A. Rieckehoff, Assistant United States
Attorney, were on brief, for appellee.

May 18, 2005

* Of the Tenth Circuit, sitting by designation.

**TORRUELLA**, **Circuit Judge**. Defendant-appellant Jorge A. Vázquez Rivera ("defendant") appeals from his conviction on one count of conspiracy to possess cocaine and heroin with intent to distribute under 21 U.S.C. § 846. For the reasons stated below, we affirm his conviction.

**I.**

We recount the relevant facts in the light most favorable to the jury verdict. See United States v. Casas, 356 F.3d 104, 109 (1st Cir. 2004).

The government presented the testimony of seven witnesses in its case in chief, six of whom testified pursuant to plea agreements. José Borrero Feliciano ("Borrero") testified that, after he was released from prison in 1991, he approached defendant about working for him in the drug business. Borrero stated that, after defendant consulted with Roberto Soto Andón ("Soto"), he began selling cocaine and heroin on behalf of defendant and Soto. According to Borrero, defendant told him that he was in charge of the drug point at the La Ceiba Housing Project in Ponce, Puerto Rico ("the Ceiba drug point"). Borrero stated that he never saw defendant sell drugs on the street, but that he went to defendant's home to replenish his drug supplies.

Alberto Negrón Constantino ("Negrón") testified that he met defendant in 1995 and sold him cocaine and heroin for distribution by Soto's drug operation. Negrón initially sold

-2-

cocaine and heroin to defendant's brother Víctor Vázquez Rivera. In late 1996 or early 1997, Negrón began working for Soto. According to Negrón, Soto removed defendant as the head of the Ceiba drug point. Negrón then took over the Ceiba drug point and began purchasing the cocaine and heroin for the drug point himself. Another co-conspirator, Daniel Sánchez Ortiz ("Sánchez"), testified that he was a drug runner in the Soto organization and that he bought and sold drugs from defendant's brother. While Sánchez never dealt directly with defendant, he was instructed by Víctor Vázquez Rivera that he was acting on behalf of defendant.

Another witness, Edwin Meléndez Negrón, stated that he had been supplied drugs by defendant for his drug point elsewhere in the Ponce area. In addition, he testified that he went to Las Cucharas jail in Ponce, Puerto Rico with defendant to visit Soto while he was confined there. Alexander Figueroa Delgado testified that he lived for about a month with a cousin who sold heroin for defendant. Finally, Yazmin Laracuente Alameda testified that after her husband was arrested on drug charges, she began selling cocaine for defendant.

Defendant appealed from the jury verdict, alleging the following: (1) improper testimony from a government witness; (2) the prosecutor's closing arguments were rife with error; and (3) defendant's sentence was improperly enhanced. In supplemental briefing, defendant also appealed his sentence on the basis that it

was imposed in violation of <u>United States</u> v. <u>Booker</u>, 125 S. Ct. 738 (2005).  We address each argument in turn.

**II.**

## A.  Improper Testimony

Defendant argues on appeal that the case agent, Iván Lugo, gave improper vouching testimony.  Because there was no contemporaneous objection, we review for plain error.  To show plain error, a defendant must show that an error occurred, which was clear and obvious; and that it affected defendant's substantial rights and seriously impaired the fairness, integrity or public reputation of the public proceedings.  <u>See</u> <u>United States</u> v. <u>Pérez-Ruiz</u>, 353 F.3d 1, 9 (1st Cir. 2003).

Defendant argues that the testimony of Agent Lugo was improper because, in the course of rebuttal, the prosecution twice elicited a statement from Lugo purporting to "certify" that Víctor Vázquez Rivera, defendant's brother, would not have received a safety valve credit if he had not incriminated the defendant. Further, defendant argues, it was improper to allow testimony that Agent Lugo "already knew" that defendant was involved in drug trafficking.

Improper vouching occurs when "prosecutors . . . place the prestige of the United States behind a witness by making personal assurances of credibility or by suggesting that facts not

before the jury support the witness's account." <u>United States</u> v. <u>Torres-Galindo</u>, 206 F.3d 136, 140 (1st Cir. 2000).

Agent Lugo initially testified in the government's case in chief. The statements that defendant objects to on appeal were given after defendant's brother, Víctor Vázquez Rivera, testified for the defense. Víctor Vázquez Rivera testified that his brother was not involved in Roberto Soto's operations and that he had never distributed cocaine or heroin. In order to impeach Vázquez Rivera's testimony, the government called Agent Lugo to the stand again. He testified to the following:

> Q [by AUSA]: Sir, did you have an opportunity to interview Víctor Vázquez Rivera?
>
> Agent Lugo: Yes, ma'am.
>
> Q: And what was the purpose of that interview?
>
> A: It was a safety valve debriefing.
>
> Q: Please explain to the members of the jury, what is a safety valve debriefing?
>
> A: Safety valve debriefing is an opportunity for the defendant [referring to Víctor Vázquez Rivera] to speak to the government and give us his admissions of their [sic] criminal activities. And this statement cannot be used against him once [he] give[s] it to us at that particular time, and in return they receive the benefit of the safety valve debriefing.
>
> Q: When you say give the opportunity, [Víctor Vázquez Rivera] an opportunity to speak about him, is he also required under the law to speak about everything he knows?

-5-

A: Yes, ma'am.

. . . .

THE COURT: Well, when you say about everything he knows, so that we are exact, the requirement on the safety valve debriefing is that he testifies about everything he knows about the offense that he is pleading to, or other offenses that have a common scheme or plan with that offense . . . .

. . . .

Q: Do you recall what, if anything, did Víctor Vázquez say about Jorge Vázquez, his brother during that debriefing?

A: Yes, ma'am. The first thing that I remember in reference to that is when I started talking to him about his brother and Robert[o Soto-Andón], he refused to talk. He said that he wasn't going to say anything regarding his brother or Robert[o Soto-Andón]. And at that point --

. . . .

A: At that point he was advised, you know, that if he didn't say everything that he knew, he couldn't receive credit.
He kept stubbornly saying that he wasn't going to say anything, that he didn't care.
At that point I contacted the U.S. Attorney's Office and advised them of the problem I was having. And you know, it was conveyed to Mr. Vázquez, Víctor Vázquez, that he had to say everything that he knew related to the charges that he had been involved, with the criminal activities he had been charged, and that part of that was talking about his brother.
He stated that he was not going to testify against his brother or anybody else and then reluctantly admitted his brother worked for Robert[o Soto-Andón], he was a runner for [him].

-6-

. . . .

Q: Sir, do you know if the government certified later on [sic] the court that Víctor Vázquez had complied with meeting with the United States and providing all information he had?

A: Yes, ma'am.

. . . .

Q: [After Agent Lugo was shown a copy of his notes] Sir, is this the only reference to Robert[o Soto-Andón] and [defendant] in any of these notes?

A: Yes, ma'am. If you notice, it has the asterisk next to it, that was when we reached the point during the interview that I began to have the problem that I mentioned earlier with Mr. Víctor Vázquez. Once I asked him about Robert[o Soto-Andón] and his brother, that was when we had that problem and I made those notations there, the asterisk. Also, the part about [defendant] being a "compadre" of --

Q: Why did you put that down?

A: Because I didn't know that. I knew about Robert[o Soto-Andón] organization, about the drug trafficking, but I had no knowledge that [defendant] was the "compadre" of Robert[o Soto-Andón]. So I felt that was something I had to write down to remember it.

Q: Who gave you that information?

A: Víctor Vázquez, ma'am . . . .

After defendant's counsel cross-examined Agent Lugo regarding his taking of notes during the safety valve debriefing, Agent Lugo gave the following testimony on redirect:

-7-

Q:     Mr. Lugo, would the government have certified that Víctor Vázquez had provided the information if he had not stated the information about his brother?

.   .   .   .

A:  No, the government would not certify him.

Defendant argues that Agent Lugo attempted to vouch for the credibility of Víctor Vázquez Rivera.  Defendant's argument fails because Agent Lugo was not attempting to bolster the credibility of any witness, he was merely explaining the procedure under 18 U.S.C. § 3553(f).  Agent Lugo was not, as defendant suggests, stating that Víctor Vázquez Rivera told the truth at the safety valve hearing, although that is its purpose.  See generally United States v. Matos, 328 F.3d 34, 39 (1st Cir. 2003)(stating that "a safety valve debriefing is a situation that cries out for straight talk; equivocations, half-truths, and veiled allusions will not do").  Instead, the statement was introduced to show that Víctor Vázquez Rivera gave a prior inconsistent statement to Agent Lugo, which contradicted his testimony during the trial.  The statement was couched in terms of the certification, but that was not meant to imply that the government was vouching for Víctor Vázquez Rivera's credibility; in fact, it sought the opposite -- to impeach by providing a statement which contradicted his trial testimony.  Cf. Pérez-Ruiz, 353 F.3d at 12  (the prohibition on

vouching extends to propping up a dubious witness through the testimony of a government agent).

Defendant also objects to the agent's testimony regarding his knowledge of the drug operation as inadmissible hearsay, and points to United States v. Casas, 356 F.3d 104 (1st Cir. 2004), as analogous to this appeal. In Casas, we held that the testimony of a government agent that the defendants were members of a drug conspiracy was inadmissible hearsay. Id. at 117-18. Defendant's argument must be rejected, however, because here the statement was not offered to prove that a conspiracy existed, but only to explain why the agent's notes had omitted certain information. See Fed. R. Evid. 801(c)(stating that hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). In Casas, the testimony was given by the case agent to prove that the conspiracy existed. Id. at 118 (stating that the agent testified as to the existence of the drug trafficking organization, that all four defendants were members and that the organization handled cocaine and heroin). It was found to be reversible error to admit the testimonial statement in that case because it sought to establish the existence of the conspiracy, i.e., the ultimate issue in the case, before the jury had made that determination. Here, as the statement was not offered for its truth, it is not hearsay.

Defendant also argues that the statement regarding the safety valve hearing was improper hearsay testimony.  Where, as here, a statement is introduced to impeach a statement that a witness provided on direct examination, the statement is admissible for that purpose.  The government argues that the evidence is admissible under Fed. R. Evid. 613(b), which provides for the admissibility of extrinsic evidence of a prior inconsistent statement by a witness as long as the witness is afforded an opportunity to explain or deny his statement.  See United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999)(holding that "comparison and contradiction are the hallmarks of Rule 613(b)").  In this case, Víctor Vázquez Rivera testified and was cross-examined and had ample opportunity to explain himself.  Id. at 559.  There was no error in allowing the testimony.

## B.  Closing Argument

Defendant argues that the Assistant United States Attorney engaged in prosecutorial misconduct during closing argument and rebuttal.  Because there was no objection made in the district court during the closing argument, we review only for plain error.  See Pérez-Ruiz, 353 F.3d at 9 (citing United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).

### 1.  Vouching During Closing Argument

"A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by,

-10-

say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." Pérez-Ruiz, 353 F.3d at 9 (citing United States v. Figueroa-Encarnación, 343 F.3d 23, 28 (1st Cir. 2000)).

The defense alleges that the following statements made during closing arguments constituted improper vouching:

> [d]id [Víctor] implicate his brother? If not, how did he get that advantage from ten to five? Because he complied with the safety valve, and he was told this is a confidential things [sic], this is for intelligence purposes.
>
> . . .
>
> Couldn't Agent Lugo come up with a better story if we're going to talk about, you know, I'm going to come and "cuadrar esto"[1] to say something that didn't happen. Consider what was not said, look at those notes. Couldn't Agent Lugo put, "Yes, he told me this, this, and this, and this didn't happen." Wouldn't that be a better story to present before the jury?
>
> And that's one thing I also ask you, when you consider are these people making up stories, couldn't they have made up a better story? They've been in jail for four years, couldn't everything have come in here "cuadrao," he lived here, he did this and this. They had all the time in the world, but that was not the case. They had contradictions like human beings are [sic].

---

[1] "Square this."

According to defendant, the prosecution improperly vouched for witnesses during closing argument because it used the fact that Víctor Vázquez Rivera got a safety valve reduction as evidence of his truthfulness. Defendant argues that the government put its prestige behind Víctor Vázquez Rivera's testimony.

Defendant argues that under United States v. Auch, 187 F.3d 125, 131-32 (1st Cir. 1999), and United States v. Manning, 23 F.3d 570, 572-73 (1st Cir. 1994), this type of vouching amounts to prosecutorial misconduct.[2] In Pérez-Ruiz, we made clear that any dictum from Auch, which "rest[ed] on an understandable misreading of [Manning]," was disclaimed. Pérez-Ruiz, 353 F.3d at 10 (stating that the statements made in Auch were not good law). During the course of the trial, defendant questioned the veracity of every witness in the government's case in chief, charging them with bias resulting from their negotiated plea and cooperating agreements.

The closing argument was "a logical counter to the assertions of defense counsel, made in summation, that various government witnesses had fabricated their testimony because they

---

[2] In Manning, this court condemned as vouching a portion of the prosecutor's statement containing the argument that a detective would have created a more damaging story had he intended to fabricate evidence. Manning, 23 F.3d at 572. The portion found to constitute vouching, though, consisted of statements at the conclusion of this line of argument to the effect that government witnesses do not lie. Id. at 572-73. In dictum in Auch, the Manning ruling was mischaracterized to suggest that the argument that a witness would have fabricated a better story had he intended to lie amounts to vouching. Auch, 187 F.3d at 131-32.

-12-

wanted the [defendant] behind bars and would stop at nothing to put him there. We typically cede prosecutors some latitude in responding to defense counsel's allegations of fabrication." Pérez-Ruiz, 353 F.3d at 9-10. Given the defense's strategy, we believe that the prosecutor was directly addressing defendant's numerous allegations of fabrication and not improperly vouching for witnesses by placing the government's prestige behind them.

## 2. Reference to murder conviction

Defendant argues that the prosecution made a gratuitous reference to Soto's murder conviction by saying that he was serving time for murder when defendant visited him at Las Cucharas and that the prosecutor argued guilt by association. "A defendant is entitled to have the question of his guilt determined by the evidence against him, not on whether a co-defendant or government witness has been convicted of the same charge." United States v. Dworken, 855 F.2d 12, 30 (1st Cir. 1988).

On the first day of trial, the government and defendant informed the judge that they had reached an agreement not to mention most or any murders that involved witnesses. Soto was convicted of first degree murder and released on probation before the conspiracy at issue here began. The government's theory of the case involved the defendant's visits to Soto's house, in particular where he went with a government witness during Soto's probation. Defendant concedes that this association was relevant to the

conspiracy, but argues that there was no need to mention the conviction and the only reason that the prosecutor did so was so the jury would be more likely to convict.

The government argues that evidence of the murder conviction was already entered into the record through the testimony of several witnesses.  See United States v. McKeeve, 131 F.3d 1, 14 (1st Cir. 1997)(holding that a prosecutor may accurately describe the testimony the jury already heard through witness testimony in the closing).  The record reveals that the comment defendant identifies referred to his continued assistance of Soto even after his murder conviction.  There was nothing improper in stating a fact that had already been entered into the record, particularly since the comment did not implicate defendant in any murder.  The charge of conspiracy was, in context, related to defendant's role as Soto's second in command for a certain period of time, which included the time Soto was on probation, under house arrest for first degree murder.

Moreover, at the beginning of the trial, counsel agreed that while certain murders would not be mentioned to the jury, there were some murders incidental to the conspiracy which would be entered into evidence.  Because there was a specific agreement between the parties, we are convinced this could not rise to any error on the part of the district court.  See Casas, 356 F.3d at 126 (where defendant specifically agreed to let the court inform

-14-

the jury about a plea agreement -- which contained mention of murders -- objections are waived).

### 3. Improper Appeal to Jury's Passion And Prejudice

Defendant argues that the cumulative effect of the closing was to inflame the jury's passions to deprive him of a fair trial. Defendant argues that the closing, as excerpted below, incited the jury to find him guilty.

> [T]here's going to be argument, oh, they were really bad people, they would rob, all they did was sell drugs, and they would consume drugs. But when you hear that argument, ask yourself, people like Borrero, who was he selling drugs for? [Defendant]. People who are smarter than him. People who have better opportunities than people like [Borrero] that just grew up at the Ceiba Housing Project, that never had an education, never had an opportunity.
>        And you think about Alexander Figueroa. Oh, he's a convicted murderer. And yes, he is, and he's a despicable human being, a person that had no pity for people like Jeannette, the 19-year-old girl that he carjacked. When you examine his testimony, I invite you, ladies and gentlemen, to consider what has Alex Figueroa done all his life? Since he was 12 years old, all he did was consume narcotics, 'meterse drogas' as they say, and rob. And rob for what? To get more money, to get more drugs.
>        And who was [sic] the drugs he was selling for? [Defendant]. I submit to you when you consider credibility, you say Alexander Figueroa is real bad, we agree he is real bad. But who was he doing that for? For people like [defendant], that you heard evidence, even from [defense] witnesses, that had better opportunities in life. That's who he was selling drugs for.

-15-

These statements are of the species of commentary that may inflame the jury's passion. Not only was the issue of drug trafficking addressed as social malaise, but it seemed to introduce an element of social standing into the closing -- that defendant was more guilty than the others because he had had the opportunity to do something with his life, but instead chose drug trafficking. We cannot say, however, that "[t]hese comments interjected issues having no bearing on the defendant's guilt or innocence and improperly appealed to the jury to act in ways other than as dispassionate arbiters of the facts." United States v. Mooney, 315 F.3d 54, 59 (1st Cir. 2002)(citations omitted). Defendant relies on United States v. Arrieta-Agressot, 3 F.3d 525, 527 (1st Cir. 1993), which found that the prosecutor's highly emotional argument, coupled with the lack of a curative instruction, was reversible error. Id. Determining whether the comments are objectionable is not the end of the inquiry. "Improper remarks are grounds for reversal only if they 'so poisoned the well' as to have likely affected the trial's outcome." Mooney, 315 F.3d at 60 (quoting United States v. Cartagena-Carrasquillo, 70 F.3d 713 706, 713 (1st Cir. 1995)). We cannot say these closing remarks would have affected the trial's outcome. The comments were brief, isolated, and repetitive of witnesses' own testimony during the government's case in chief. Mooney, 315 F.3d at 60.

Defendant also argues that the prosecution, in closing, improperly referred to defendant's testimony, intimating it was untruthful.  The prosecutor stated "[w]ho has the most interest in the outcome of this case? [Defendant], who takes the stand and tells you, ladies and gentlemen, that [Soto's] dad asked him to go visit him in jail so he can talk to him."  However, on this issue, as above, the government argues that the defense had put every witnesses's credibility at issue.  Under such circumstances, this type of reference cannot fairly be construed as an inappropriate reference to defendant's credibility.  See Pérez-Ruiz, 353 F.3d at 9-10.

Finally, defendant argues that, given the prosecution's behavior during the trial, he was denied a fair trial.  We have held that "individual errors insufficient of themselves to necessitate a new trial may in the aggregate have a more debilitating effect."  United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993).  Defendant argues that this was such a case because: there was sufficient reason to disbelieve the government's witnesses given their strong incentives to testify against defendant; witnesses' testimony had factual errors; they were all housed in the same federal prison; and the prosecution had no physical evidence against defendant.  Since we believe no errors were committed in the course of the trial, defendant's argument regarding due process fails.

## C. Sentencing

Following the jury verdict, the defendant's case was transferred to a sentencing judge who reviewed the trial transcript and imposed a sentence based on the United States Sentencing Guidelines ("USSG"). The sentencing judge accepted the pre-sentence report's ("PSR") drug quantity recommendation of five to fifteen kilograms, and imposed a three-level enhancement under USSG § 3B1.1(b) for the defendant's role in the offense and a two-level enhancement under USSG § 2D1.1(b)(1) for weapon possession. The resulting sentencing range was 210 to 262 months. The applicable range was reduced to 210 to 240 months because of the twenty-year statutory maximum.[3] 21 U.S.C. § 841(b)(1)(C). The judge imposed a sentence of 210 months in prison and three years of supervised release. The defendant objected to all three of the sentencing judge's findings in a written response to the PSR, arguing, with references to Apprendi v. New Jersey, 530 U.S. 466 (2000), that imposition of a sentence based on facts not found by a jury constituted a violation of his due process rights.

Both parties submitted supplemental briefing following the Supreme Court's decisions in Blakely v. Washington, 124 S. Ct. 2531 (2004), and United States v. Booker, 125 S. Ct. 738 (2005). The defendant argues that the sentencing judge violated the rule

---

[3] Without the findings in question, the Guidelines sentencing range would have been ten to sixteen months.

announced in Booker by imposing a sentence on the basis of a mandatory Guidelines system, and that the sentence should therefore be vacated and the case remanded for resentencing.

The Booker holding applies to all cases, like the present one, pending on direct review at the time it was decided. 125 S. Ct. at 769. In United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005), we concluded that "[t]he argument that a Booker error occurred is preserved if the defendant below argued Apprendi or Blakely error or that the Guidelines were unconstitutional." Id. In the pre-Blakely sentencing proceedings below, the defendant argued, citing Apprendi, that imposition of a Guidelines sentence based on facts not found by the jury was unconstitutional. Thus, under the liberal standard of Antonakopoulos, the Booker error was preserved.

In its supplemental brief on Booker, the government concedes the error was preserved, but, for the first time, argues that the defendant has waived the Blakely/Booker argument by failing to raise it in his initial brief on appeal.[4] While we have

_____

[4]  The government notes, further, that defendant's opening brief acknowledged that "the sentencing judge correctly determined that under Apprendi v. New Jersey, 530 U.S 466 (2000), the maximum sentence was 20 years, under 21 U.S.C. § 846." This assertion -- contained in a footnote describing the sentencing judge's correct application, due to the absence of a specific quantity in the indictment or jury findings, of the statutory sentencing range for an uncharged quantity of drugs -- was not addressed to the implications of Apprendi for the constitutionality of Guidelines enhancements based on judge-found facts. We therefore do not read it as waiving or forfeiting the constitutional objections

often reiterated that issues raised only in a reply brief or at oral argument are generally considered waived, we will exercise our discretion to consider new issues under exceptional circumstances. See, e.g., N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 45 (1st Cir. 2001) ("[A]bsent exceptional circumstances, an appellant cannot raise an argument for the first time in a reply brief."). In the instant case, the parties' briefs were submitted prior to a substantial change in the applicable law wrought by the Supreme Court's decisions in Blakely and Booker. This change constitutes an "exceptional circumstance" in which we will permit new issues to be raised, and we accordingly accepted supplemental briefing from both sides. See DSC Communications Corp. v. Next Level Communications, 107 F.3d 322, 326 n.2 (5th Cir. 1997) (finding issue raised only in supplemental brief not waived because "[w]e are unwilling to ignore [an] important clarification of the law, and perpetuate incorrect law, merely because [a controlling case] was decided after briefing and oral argument in this case"); cf. Anderson v. Beatrice Foods Co., 900 F.2d 388, 397 (1st Cir. 1990) (finding argument waived because, inter alia, appellant "did not make it in the supplemental briefing before us"). Likewise, in our recent decision in United States v. Serrano-Beauvaix, 400 F.3d 50 (1st Cir. 2005), another panel of this court considered the merits of a Booker argument not raised in appellant's opening brief. See

_____

underlying the instant Booker argument.

-20-

Supplemental Brief for Appellee at 7, <u>United States</u> v. <u>Serrano-Beauvaix</u>, 400 F.3d 50 (1st Cir. 2005) (No. 02-2286) (arguing that <u>Booker</u> argument was waived due to failure to assert in opening brief). Thus, we will proceed to review the defendant's preserved <u>Booker</u> claim.

### 1. Standard of review

As we indicated in <u>Antonakopoulos</u>, the <u>Booker</u> error "is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system." 399 F.3d at 75. Nevertheless, the Supreme Court drew a distinction in <u>Booker</u> between those cases in which the sentencing court erred only in applying mandatory Guidelines, and those with an underlying constitutional violation, in which the mandatory Guidelines sentence was based in part on facts not admitted by the defendant or found by a jury. 125 S. Ct. at 769 (vacating both defendants' sentences while recognizing that Booker's sentence violated the Sixth Amendment but Fanfan's, which was based solely on the facts found by the jury, did not). The Court instructed that we "must apply [<u>Booker</u>'s] holdings -- both the Sixth Amendment holding and our remedial interpretation of the Sentencing Act -- to all cases on direct review." <u>Id.</u> Nevertheless, the Supreme Court did not anticipate that all <u>Booker</u> errors would require remand and

-21-

resentencing, in part "because, in cases not involving a Sixth Amendment violation, whether resentencing is warranted or whether it will instead be sufficient to review a sentence for reasonableness may depend upon application of the harmless-error doctrine." Id.

The defendant seizes on this sentence, arguing that it implies that cases that do involve a Sixth Amendment violation must be automatically remanded, without harmless error review. We agree that the defendant's sentence involved a Sixth Amendment violation within the meaning of Booker: neither the drug quantity, the defendant's role in the offense, nor his responsibility for the possession of a firearm by a co-conspirator were admitted by the defendant or found by the jury. Nevertheless, we disagree that harmless error review is inapplicable to such cases.

The language the defendant relies upon from Booker anticipates the outcome of harmless error review in cases challenging only the mandatory application of the Guidelines, but it does not preclude harmless error review of cases involving an underlying Sixth Amendment violation.[5] The Supreme Court has made

---

[5] The defendant's references to Sullivan v. Louisiana, 508 U.S. 275 (1993) are not on point. Sullivan addressed the inapplicability of constitutional harmless error review to a jury conviction made without an adequate reasonable doubt instruction. A reviewing court cannot determine that the same verdict would have been rendered had the proper instruction been given, without itself violating the constitutional guarantee of a jury trial. Id. at 279. With Booker error, in contrast, we are dealing with the decision process of a sentencing judge. It may well be possible to

-22-

clear that not all errors of constitutional dimension require automatic reversal. <u>Chapman</u> v. <u>California</u>, 386 U.S. 18, 22 (1967). As we explained in <u>Antonakopoulos</u>, it is not certain that a sentence would always be different under the advisory regime. 399 F.3d at 80. Indeed, sometimes the opposite may be clear, as when a sentencing judge has explicitly stated that he would impose the same sentence even if he had discretion to depart from the Guidelines. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Carpenter</u>, -- F.3d --, 2005 WL 708335, at *5 (1st Cir. Mar. 29, 2005) (finding no plain error where sentencing judge stated that, even if he had discretion depart from a Guidelines sentence, he would not do so). Moreover, even when it involves an underlying Sixth Amendment violation, <u>Booker</u> error is not structural in nature. <u>Id.</u> at 80 n.11. Thus, preserved <u>Booker</u> error does not require an automatic remand, but must be reviewed for harmlessness. <u>See</u> Fed. R. Crim. P. 52(a) (error not affecting substantial rights shall be disregarded).

The burden of proving that the preserved <u>Booker</u> error did not affect the defendant's substantial rights lies with the government. <u>See</u> <u>Chapman</u>, 386 U.S. at 24. The standard of proof, however, depends on whether the error is conceived of as constitutional. <u>Compare</u> <u>id.</u> ("[B]efore a federal <u>constitutional error</u> can be held harmless, the court must be able to declare a

---

determine, on the basis of the judge's articulated rationale, whether the same sentence would have been imposed under an advisory Guidelines regime.

-23-

belief that it was harmless beyond a reasonable doubt.") (emphasis added), with Kotteakos v. United States, 328 U.S. 750, 764-65 (1946) (determining that error is not harmless if court "is left in grave doubt"); see also O'Neal v. McAninch, 513 U.S. 432, 437-38 (1995) (comparing Chapman and Kotteakos standards). Since we have described the Booker error as the mandatory application of the Guidelines, and since under an advisory Guidelines regime a judge may make findings of fact without falling afoul of the Constitution,[6] one might surmise that Booker error is not constitutional error. This conclusion would be incorrect in the instant case, where a mandatory Guidelines sentence was imposed on the basis of judge-found facts.[7] Mandatory application of the Guidelines in such a case violates the defendant's Sixth Amendment

---

[6] As the Second Circuit explained in United States v. Crosby, 397 F.3d 103, 109 n.6, (2d Cir. 2005), "[a]s a result of the Remedy Opinion in Booker . . . the maximum lawful sentence is the statutory maximum sentence, and because judicial fact-finding under advisory guidelines cannot increase that lawful maximum, judicial fact-finding now encounters no Sixth Amendment difficulties." See Booker, 125 S. Ct. at 750 ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant.") (Stevens, J.); id. at 764 ("[W]ithout this provision . . . that makes the relevant sentencing rules . . . mandatory and impose[s] binding requirement[s] on all sentencing judges -- the [Guidelines] statute falls outside the scope of Apprendi's requirement.") (Breyer, J.).

[7] We express no opinion as to whether Booker error arising out of the mandatory application of the Guidelines alone, without any underlying Sixth Amendment violation, is constitutional in nature. Cf. United States v. Haidley, 400 F.3d 642, 645 (8th Cir. 2005) (declining to determine whether such error "was of constitutional magnitude").

rights.  See Booker 125 S. Ct. at 756.  Because the defendant was "denied a federal constitutional right," Chapman 386 U.S. at 20, the government has the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights. Id. at 24; see also United States v. Pérez-Ruiz, 353 F.3d 1, 17 (1st Cir. 2003) (applying Chapman harmless error standard to Apprendi violation).  That is, we must be convinced that a lower sentence would not have been imposed had the Guidelines been advisory.  This is an extremely difficult, but not impossible, standard to meet.  While the government, in light of the difficulty of meeting its burden, has on occasion conceded to remand for Booker error, see, e.g., United States v. Mercado Irizarry, -- F.3d --, 2005 WL 825747, at *4 (1st Cir. Apr. 11, 2005), it has not done so here.

## 2.  Harmless error

The government contends that the sentencing judge's belief that the Guidelines were mandatory did not contribute to the defendant's sentence, but it has failed to meet its heavy burden of proving this claim beyond a reasonable doubt.  In support of its position, the government refers to statements made by the sentencing judge that suggest he was convinced of the factual basis for the enhancements he applied.  But even if, as the government further alleges, each factor were supported by overwhelming evidence, factual certainty alone would not be sufficient to show

-25-

beyond a reasonable doubt that the judge, acting under an advisory Guidelines system, would have applied the same sentence on the basis of those factors. In the instant case, the government has pointed to no statement or action of the sentencing judge that would assure us that he would have imposed the same sentence in the absence of mandatory Guidelines. To the contrary, our doubt on this point is enhanced by the fact that, while the applicable Guidelines constrained the sentencing judge to the upper margin of sentences available under 21 U.S.C. § 841(b)(1)(C), the sentence he chose was at the low end of that margin.

Finally, the government suggests that we may find the Booker error harmless if we determine that the resulting sentence is reasonable. See Booker, 125 S. Ct. at 767 ("The district courts, while not bound by the Guidelines, must consult those Guidelines and take them into account when sentencing. The courts of appeals review sentencing decisions for unreasonableness.") (internal citation omitted). This argument is without merit. The reasonableness standard is to be used in reviewing sentences imposed in compliance with Booker. See id. at 769 (suggesting that if Booker error is harmless in cases not involving Sixth Amendment violation, resulting sentence may only require reasonableness review). The defendant's sentence did not comply with Booker. Even if we determined that a 210 month sentence was reasonable based on the facts considered at sentencing, we could not rule out

-26-

the possibility that, under advisory Guidelines, the sentencing judge would have imposed a lower reasonable sentence. Thus, we hold that the government has failed to meet its burden of showing that the Booker error was harmless.

### 3. Remedy

Two distinct options are available to remedy preserved Booker error that has not been proven harmless. We can vacate the sentence and remand for resentencing, or we can follow the lead of the Second Circuit and remand for a determination of whether the sentencing judge would have applied a different sentence under an advisory Guidelines regime. See Crosby, 397 F.3d 116-18. Although the Second Circuit deemed a Crosby remand "appropriate in order to undertake a proper application of the plain error and harmless error doctrines," id. at 117, it has only been applied in unpreserved error cases, and appears to have been directed largely at avoiding construing doubt about prejudice in the context of plain error review against defendants, see United States v. Williams, 399 F.3d 450, 457-61 (2d Cir. 2005).[8] Nevertheless, the Crosby remand does have the added benefits of avoiding the need to

---

[8] We note that the Seventh Circuit has also developed a partial-remand procedure for determining prejudice in cases of unpreserved Booker error. See United States v. Paladino, 401 F.3d 471, 483-84 (7th Cir. 2005). It did not, however, apply that procedure to remedy a finding that a preserved Booker error was not harmless, opting instead to vacate the sentence and remand for resentencing. See United States v. Schlifer, -- F.3d --, 2005 WL 774914, at *5 (7th Cir. Apr. 7, 2005).

convene a resentencing hearing -- a much more administratively taxing event than a sentencing judge's reevaluation on a <u>Crosby</u> remand -- in cases where the sentencing judge determines that the same sentence would have been imposed under advisory Guidelines. <u>Id.</u> at 459. It also avoids, again in cases where the sentence would not have changed, the quandary of whether aggravating or mitigating facts that have arisen since the original sentencing can be considered. <u>Id.</u>

Despite these advantages, we decline to engage in this sort of limited remand for preserved <u>Booker</u> error when the government has failed to prove harmlessness. We do not anticipate that there will be so many such cases that reconvening sentencing hearings will create a significant administrative burden. And, while the problem of newly arisen sentencing factors is significant, it will have to be addressed if a sentencing court determines that a different sentence would have been imposed under advisory Guidelines. Thus, we cannot be certain of avoiding the problem with <u>Crosby</u> remands.

Given the limited benefit of <u>Crosby</u> remands in the context of preserved error, we prefer to follow a more traditional route. Although this is a case of first impression, roughly analogous precedent exists in those cases where we have found that the sentencing judge mistakenly believed that he was without authority to depart from a Guidelines sentence. <u>See</u> <u>United States</u>

v. Delgado-Reyes, 245 F.3d 20 (1st Cir. 2001); Mariano v. United States, 983 F.2d 1150 (1st Cir. 1993). In both cases, despite the possibility that the judge might have opted not to depart, we vacated the sentence and remanded for resentencing. See Delgado-Reyes, 245 F.3d at 23-24 (remanding because sentencing judge "seemed inclined" to accept joint stipulation that lower range applied); Mariano, 983 F.2d at 1150 (remanding where we were "unable confidently to say . . . that the judge's error was harmless"). We will do the same here.

Because we remand for resentencing under Booker, we will not consider the defendant's remaining claim that the facts found by the sentencing judge are insufficient to support the enhancements applied. The new sentence will, however, be subject to reasonableness review should it be challenged in the future. Booker, 125 S. Ct. at 765.

## III.

For the reasons stated above, we affirm the defendant's conviction, but vacate his sentence. We remand to the district court for resentencing in accordance with the Sentencing Reform Act of 1984, Pub. L. 98-473, Title II, §§ 211-238, 98 Stat. 1987 (1984), as altered in Booker.

**Affirmed, Vacated and Remanded**.