# United States Court of Appeals
## For the First Circuit

No. 08-1463

UNITED STATES OF AMERICA,

Appellee,

v.

SALVI RAFAEL BENITEZ-AVILA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Leval[*], and Lipez,
Circuit Judges.

José C. Romo Matienzo for appellant.
Germán A. Rieckehoff, Assistant United States Attorney, with whom Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Rosa E. Rodríguez-Vélez, United States Attorney, were on brief for appellee.

June 9, 2009

[*] Of the Second Circuit, sitting by designation.

**LEVAL**, <u>Circuit Judge</u>. Defendant Salvi Rafael Benitez-Avila appeals from his conviction on numerous counts arising from his armed robbery of a consular representative of a foreign government. 18 U.S.C. § 112(a). On appeal, Defendant's primary contention is that the court erred in admitting hearsay evidence which tended to identify him as the assailant. We agree with Defendant that the evidence should not have been received. However, in light of the very strong evidence of his guilt, the error was harmless. We therefore AFFIRM his conviction.

## BACKGROUND

The evidence, viewed in the light most favorable to the verdict, was as follows. <u>See</u> <u>United States</u> v. <u>Casas</u>, 356 F.3d 104, 109 (1st Cir. 2004). On the evening of August 4, 2005, Adriana Bolaños ("Bolaños"), who was Costa Rica's Consul General to the United States (assigned to Puerto Rico), accompanied by her ten-year-old step-daughter, Valeria Larco ("Valeria"), went to a Total Gas Station which was owned by her husband, Victor Larco ("Larco"), to pick up the day's cash receipts and take them to the bank.

Bolaños went into the sales-booth in the mini-mart of the gas station, tallied the sales in the cash register (which totaled approximately $8,000), placed the money in her purse, and stepped out of the mini-mart. As Bolaños and her step-daughter stepped out they were approached by two men, one of whom held an assault rifle.

The man with the rifle (the "assailant") pointed it at Bolaños, grabbed her by the arm, pointed the weapon at her ribs, and demanded her purse. After a struggle, Bolaños gave him her purse and he ran away.

Two days later, Bolaños saw him again as she went to the gas station to buy milk. Terrified, she got into her car and sped off.

On August 9, 2005, Bolaños was interviewed by Officer Emmanuel Martínez ("Martínez") of the Puerto Rico Police Department and described the assailant. Bolaños also told Officer Martínez that if she were to see her assailant again, she would be able to identify him because she had struggled with him and he was right in front of her during the struggle.

Bolaños also met with Agent Seth Emers ("Emers") of the Diplomatic Security Service ("DSS") of the United States Department of State. Emers asked Bolaños to come to the DSS office, which had access to a computerized database of pictures of and information about people with criminal records. The database allows the user to search based on criteria such as race, gender, age, physical traits, height, address, and aliases.

Agent Emers and Officer Martínez used this database and descriptors they had of the assailant to generate photographs of suspects. They showed Bolaños approximately 10 to 15 photographs of potential suspects on the computer. While Bolaños did not say

definitively that any of the photographs showed the assailant, she did say of Defendant's photograph that it closely resembled the assailant, commenting on the short dark hair, similar complexion, and facial hair.

Emers created another photo array of suspects (including Defendant), which he sent electronically to be shown to Valeria, who had returned to Peru where she lives with her mother. Valeria made no identification.

Believing that the robbery had probably been an "inside job" in which an employee had tipped off the robbers that Bolaños would be leaving the gas station with a large amount of cash, the investigating officers interviewed employees and former employees of the gas station, including Tania Rosario ("Rosario"), who had worked at the Total station the night of the incident.

They also subpoenaed telephone records which showed that Rosario and her friend, Lina Rivera ("Rivera"), who was also present at the gas station the night of the robbery, had placed calls to a common telephone number on the night of the robbery, including one just prior to the robbery. The number they called was a prepaid cell phone for which no subscriber information was available. However, the number was listed in Rosario's contacts as "El Pri," which can be an abbreviation of "primo," or cousin. Defendant, Rosario, and Lina Rivera were close friends, all living

-4-

in a small neighborhood called Barrio Colo, and called one another "primo."

Agent Emers testified that Bolaños's husband Larco had received a tip from an informant that one of the assailants was known as "Gemelo," which in Spanish means twin. Emers added that Defendant is a twin, having established that fact by examining mugshots of Defendant and his now deceased twin brother, and seeing that they "looked exactly alike."

Emers and Martínez tried to locate Defendant but could not find him at his house or his girlfriend's house, so they left him a citation to appear at the police station. They then asked Rosario to call Defendant in their presence, using her cellular phone.

Emers watched as Rosario placed the call. She called the number she had called on the night of the robbery, which was listed in her cell phone as "El Pri." Emers was able to hear Rosario's conversation. Rosario identified herself as cousin. She followed Emers's directions: to state that the investigators did not have any hard evidence as to what happened, that he shouldn't worry, and that he should come into the police station as instructed. Defendant showed up at the police station the very next morning, although the citation directing him to appear was for two days after. He was asked to come back, because they were not prepared for the lineup.

Some time later, when the police were prepared to stage a lineup, they called Defendant to return. Bolaños came to the police station to view a lineup. The lineup included Defendant and four police officers. The police officers placed in the lineup were "comparable looking" to Defendant. In accordance with police procedure, they were all similar in race, color, and size to Defendant. All had short, dark hair, similarly styled to Defendant. All five men in the lineup wore blue robes and booties so that they were dressed the same and so that their shoes were concealed. Because the police officers did not have facial hair but Defendant did, facial hair was drawn on the police officers with a liner. Bolaños did not see the preparations for the lineup.

Defendant stood in position number 3, the middle of the lineup. Bolaños viewed the lineup from the other side of a large glass window in an adjoining room. Prior to viewing the lineup, she was instructed several times to identify her assailant only if she could do it with absolute certainty. When the vertical blinds on the glass window went up, Bolaños almost immediately identified Defendant and became nearly hysterical. Defendant was then arrested.

At trial, both Bolaños and Valeria identified Defendant as the armed robber.

**DISCUSSION**

I.      **Hearsay**

Defendant contends on appeal that, over his objection, the court erroneously admitted prejudicial, incriminating hearsay. His argument has considerable merit. We review the denial of a hearsay objection for abuse of discretion. United States v. Barone, 114 F.3d 1284, 1296 (1st Cir. 1997).

a.    **The "Twin" Hearsay**

The inadmissible evidence in question, as recited above, was the following: Agent Emers testified that the owner of the Total Gas Station received a tip from an informant that the assailant was someone known in the street as "Gemelo," or the "Twin." Emers then testified Defendant was a twin, explaining that he had examined photographs of Defendant and Defendant's deceased brother which "looked exactly alike."

Both branches of this testimony - the part telling that the robber was known as the "Twin" and the part telling that Defendant was a twin - were hearsay. Hearsay evidence proves a fact by a statement made out of court which asserted the fact as true. Fed. R. Evid. 801(c). The principal vice of hearsay is the inability of the opponent of the evidence to cross-examine the person who made the out-of-court statement (the "declarant"). The opponent of the evidence is thus unable to get the declarant's testimony as to whether in fact the declarant said what has been

attributed to him, what he meant by it, whether he had a reliable basis for the assertion, and whether he might have been influenced by a bias which undermines his reliability. Barone, 114 F.3d at 1292 ("The rule against hearsay reflects concerns about the trustworthiness of out-of-court statements, arising from the fact that such statements are not subject to the tests normally applied to in-court testimony to ensure its reliability.")

The evidence that the robber was a person known in the street as "Twin" was double hearsay. It demonstrated that the robber was known as "Twin" by a statement made out of court which asserted that fact as true. Agent Emers was testifying to what he had been told by Larco, who in turn was relying on something he had been told by an unnamed informant. Defendant had no opportunity to cross-examine Larco on whether he was quoted correctly by Emers, much less to cross-examine the unknown informant to determine whether he said the robber was known as Twin, and if so whether he had a sound basis for saying it.

The demonstration that Defendant was a twin through Emers's testimony was also hearsay. It depended on the proposition that the two identical looking photos were in fact photos of Defendant and of his brother. There was neither evidence of a nonhearsay nature, nor foundation for an exception to the hearsay rule, such as Fed. R. Evid. 803(8) (public records and reports), to

support the conclusion that the photographs were in fact of Defendant and his brother.

Through hearsay, these two parts of Emers's testimony told the jury that the robber was a twin, and that Defendant was a twin – which in combination gave considerable corroboration to the legitimate evidence identifying Defendant as the robber, without Defendant having any meaningful opportunity to challenge it by cross-examination.

The government argues that there was no violation of the hearsay rule. It asserts that the evidence was not offered to prove the truth of the matter stated in the out-of-court statements – that the robber was known as Twin and that Defendant was a twin – but rather to show that Agent Emers had a reasonable basis for focusing his investigation on Defendant.

The government is of course correct that an out-of-court statement, which would be inadmissible hearsay if offered to prove the truth of what was asserted in the statement, may be properly admitted to prove other facts, such as the awareness of the declarant, or of the person to whom the statement was made, of what was said in the statement. See United States v. Murphy, 193 F.3d 1, 6 n.2 (1st Cir. 1999). The admissibility of an out-of-court statement to prove some fact other than what was asserted in the statement, however, assumes that the other fact for which the statement is received is relevant to an issue in the trial and, if

so, that the potential for prejudice resulting from the likelihood that the jury might consider the statement for its impermissible hearsay purpose does not unfairly outweigh its proper probative value on the other question. Fed. R. Evid. 403.

In this instance, the evidence fails those tests. Agent Emers's basis for focusing his investigation on Defendant was not a relevant issue in the trial. The issue in a criminal trial, upon which the government bears the burden of proof, is whether the evidence proves the defendant's guilt beyond a reasonable doubt. Whether government agents had a reasonable, good faith basis for investigating the defendant is a completely different question, which is not in issue unless the defendant puts it in issue.[1] The government does not suggest that Defendant had challenged Emers's good faith in focusing his investigation on Defendant, so as to put in dispute whether Emers had a bias which led him to fabricate evidence against Defendant. In the absence of a challenge by Defendant, Emers's good faith was not in issue so that evidence demonstrating his basis for focusing his investigation on Defendant was not relevant.

---

[1] If the defendant undertakes to impeach the government's evidence of his guilt by suggestions that the agents who investigated him were motivated by bias or mistake, etc., these issues may then become relevant. See United States v. Cruz-Diaz, 550 F.3d 169, 176-80 (1st Cir. 2008); see also United States v. Maher, 454 F.3d 13, 19-20 (1st Cir. 2006) (criticizing admission of similar evidence to show context, but finding no plain error).

We recognize that prosecutors, in an effort to make the evidence of defendants' guilt more lively and to captivate the jurors with the drama of the hunt for the solution to the crime, will often organize the presentation of the evidence of guilt in the form of a narrative of the investigation. We do not suggest that prosecutors are prohibited from organizing the legitimate evidence in a lively, appealing manner. But it does not follow that, by choosing a more seductive narrative structure for the presentation of the evidence of guilt, prosecutors expand the scope of the relevant legitimate evidence, so as to convert prejudicial and otherwise inadmissible evidence into admissible evidence. See United States v. Reyes, 18 F.3d 65, 70 (2d Cir. 1994). Had the Assistant United States Attorney simply presented the evidence which told the jurors the facts of the robbery and identified Defendant as the robber, it is clear that the "twin" hearsay would not have been admissible. It did not become admissible merely because the AUSA chose to present the story to the jury in a more exciting form, catching them up in the chase. A prosecutor cannot justify the receipt of prejudicial, inadmissible evidence simply by calling it "background" or "context" evidence, or by asserting that it has a nonhearsay relevance to an issue that is itself not relevant. See id. (a court must examine "whether the probative value of this evidence for its non-hearsay purpose is outweighed by

the danger of unfair prejudice resulting from the impermissible hearsay use of the declarant's statement").

We have previously warned the government against "misguided use" of hearsay testimony and have cautioned that, by offering such evidence, the government risks losing convictions it has obtained. Casas, 356 F.3d at 117-118, 120. It seems appropriate to repeat that caution. It should be clear enough that the prosecution would have been prohibited by the hearsay rule from introducing testimony by Emers that Larco had been told by an informant that Defendant committed the robbery. The "twin" evidence here received, although slightly less prejudicial, was inadmissible for the same reasons. In some circumstances, we might well be compelled to vacate the conviction of a guilty defendant because of the ill advised introduction of inadmissible hearsay under the claim that it served a nonhearsay purpose in relation to an issue, which in fact was neither important, nor even relevant, to the issues in dispute.

The cases cited by the government in justification are not to the contrary. The proposition that hearsay does not include statements showing context or background and not received for the truth of what they said should not be understood to mean that any kind of statement, no matter how prejudicial, may be introduced if it shows what might loosely be described as context or background. First, the aspects of "context" or "background" for which the

-12-

evidence is offered must be relevant.  And even if it is relevant its probative value in relation to the nonhearsay purpose must not be "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403.  Although we have previously approved of the receipt of statements offered for a nonhearsay purpose such as to show context or background, one must carefully examine the facts to understand the basis for admission in each case.

In United States v. Bailey, 270 F.3d 83 (1st Cir. 2001), the contested evidence was an agent's testimony that a conspirator, who was caught collecting a shipment of a barrel of marijuana, agreed to cooperate with the government by having agents accompany her to deliver the barrel to the intended recipient.  She then drove her van to her residence, with two task force agents hiding in the back, and placed a phone call, punching in a code.  Fifteen minutes later, the defendant came up to the van, opened the back of the van, and fled upon seeing the agents, but was apprehended.  Id. at 87.  The agents recovered his pager, which reflected receipt of the call from the cooperator's telephone and the code she had entered.  In rejecting the defendant's claim of hearsay, we stressed that the evidence did not include any out-of-court statement of fact which could be considered for its truth; it included only conduct of the cooperator upon having agreed to cooperate by delivering the barrel to its intended recipient, and the defendant's actions.  "The agent did not testify that [she]

pointed at [the defendant] or in any way made an out of court declaration regarding his identity." Id. at 87. While the opinion included the proposition that "statements offered only for context[] do not constitute hearsay," id., our reasoning relied on the fact that there had been no statement of any kind – only conduct, and that conduct which asserts no fact is not hearsay. The opinion gives no support to the proposition here advanced by the government that an out-of-court statement of the cooperating coconspirator identifying the defendant as the intended recipient would have been admissible for the nonhearsay purpose of explaining the reasonableness of the agents' conduct in then arresting the defendant. To the contrary, in stressing that the cooperator did not "point[] at [the defendant] or in any way make an out of court declaration regarding his identity [as the intended recipient of the marijuana]," we strongly implied that had she made such a statement, it would have been inadmissible hearsay, notwithstanding its capacity to explain why the agents arrested the defendant.

In United States v. Rodriquez, 525 F.3d 85 (1st Cir. 2008), the defendant contended that his conviction should be vacated because of the receipt of unfairly prejudicial, incriminating hearsay testimony of a government agent, which summarized testimony of other witnesses but as to some details went beyond it. We stated expressly that the agent's statements "constituted improper hearsay testimony." Id. at 96. When it came

to determining whether to overturn the defendant's conviction on that basis, we found that the legitimate evidence so powerfully proved not only the defendant's guilt, but also most of what the agent had improperly testified to, that the hearsay was "not so unfairly prejudicial" as to warrant overturning the conviction, id. at 98, especially in view of the fact that the defendant needed to "surmount the high hurdle of plain error review" as a result of his failure to object. Id. at 96. It is odd that the government cites this case as approval of the nonhearsay nature of the evidence it introduced here when we explicitly confirmed that the testimony "constituted improper hearsay" and we furthermore stressed that "[t]his court on several occasions has strongly cautioned the Government against the practice." Id. at 95-96.

In United States v. Vazquez-Rivera, 407 F.3d 476 (1st Cir. 2005), the defendant was charged with drug selling on behalf of the Soto drug dealing organization. The defense called the defendant's brother, Victor, who testified that the defendant was "not involved in Roberto Soto's operations and . . . never distributed cocaine or heroin." Id. at 481. To impeach Victor's denial that the defendant dealt in drugs, the government then called an agent who had interviewed Victor when Victor was charged with drug dealing and was seeking the benefit of the "safety valve" provisions of 18 U.S.C. § 3553(f), which under certain circumstances allows defendants to be sentenced below the mandatory

-15-

minimum if they truthfully provide to the government all information and evidence they have concerning their offense and offenses that were part of the same course of conduct or a common scheme or plan. The agent testified that Victor had initially refused to talk about his brother or about Roberto Soto. When told that he could not receive credit under the safety valve provision unless he told what he knew, Victor eventually "admitted that his brother worked for [Soto] . . . he was a runner for [him]." Id. at 481. The agent was then shown a copy of the notes he took during this interview. When asked why he had written down that the defendant was a "compadre" of Soto, the agent answered, "Because I didn't know that. I knew about [the Soto] organization, about the drug trafficking, but I had no knowledge that [defendant] was the 'compadre' of [Soto]. So I felt that was something I had to write down to remember it." Id. at 482.

On appeal, the defendant contended that the agent's report of Victor's prior statements was hearsay. We rejected the claim, explaining that prior inconsistent statements are admissible to impeach a witness's testimony. As for the agent's statement that he knew about the Soto organization, we found that it was not hearsay because it was received not to prove that a conspiracy existed but rather to explain why the agent had omitted that information from his notes. Id. at 482-83.

-16-

What we said in Vazquez-Rivera, however, does not justify the government's offer of the "twin" hearsay in this case. The question here is not whether a statement made out of court may be received to prove some relevant fact other than the truth of what it asserts. That proposition is well-established. See Bailey, 270 F.3d at 87. It does not follow, however, that an investigating agent may testify to having received hearsay information which shows the defendant's guilt to explain something that is not a relevant issue, such as why the agent focused the investigation on the defendant. When an out-of-court statement is received to prove something other than what was asserted in the statement, the nonhearsay issue must be relevant. Fed. R. Evid. 401. Furthermore, the "danger of unfair prejudice" from the hearsay must not "substantially outweigh[]" the probative value from the nonhearsay purpose. Fed. R. Evid. 403. In this case, the danger of prejudice from the jury's consideration of the hearsay statement as proof of what it asserted far outweighed the proper probative value of the evidence, which was nil.

**b. Rosario's call to the Defendant.** Defendant also contends that the court erred in admitting testimony about the telephone call Rosario placed in Emers's presence. Emers testified that, after the police had left Defendant a citation to appear at the police station, Rosario, following Emers's instructions, placed a call to the number her telephone was shown to have called on the

night of the robbery, which number was listed in her contacts as "El Pri," an apparent abbreviation of el primo, or cousin. Emers testified that he heard Rosario identify herself as cousin and say that the police did not have any hard information, so that he should not worry but should go to the police station.

With respect to this evidence, Defendant's hearsay objection is without merit. It was not hearsay. It reported conduct observed by Emers to confirm that Rosario, who worked at the gas station, had functioned as Defendant's accomplice, tipping him off that Bolaños was about to carry out the cash register receipts. Emers's firsthand account of what he heard in the telephone call showed that Defendant and Rosario had a close, trusting relationship and called each other cousin, as suggested in Rosario's contacts list, and that Defendant, who presumably knew Rosario had been questioned about the robbery, was worried about what the police knew about the robbery.

While this evidence did involve the repetition of things that had been said out of court, none of it tended to prove the truth of any fact asserted in out-of-court statements. And when Defendant came to the police station the next morning in response to Rosario's call to the number of "El Pri," which she had called on the day of the robbery, it showed that Defendant was the person Rosario had called just before the robbery.

-18-

## II.      Harmless Error

One of Defendant's hearsay objections has merit.  The other does not.  The question for the Court is whether Defendant's conviction should be overturned by reason of the erroneous admission of the hearsay relating to the "twin" issue. We conclude that it should not.  Defendant's guilt was thoroughly and convincingly established.  While the "twin" hearsay should not have been received, we conclude that it was ultimately of little or no importance.  There is no reasonable likelihood that the verdict would have been any different in the absence of this hearsay evidence.  Improper admission of testimony is "harmless if it is highly probable that the error did not influence the verdict." Casas, 356 F.3d at 121.  "There is no bright-line rule"; the "harmlessness determination demands a panoramic, case-specific inquiry considering, among other things, the centrality of the tainted material, its uniqueness, its prejudicial impact, the uses to which it was put during the trial, the relative strengths of the parties' cases, and any telltales that furnish clues to the likelihood that the error affected the factfinder's resolution of a material issue."  Id. (quoting United States v. Sepulveda, 15 F.3d 1161, 1182 (1st Cir. 1993)).  In view of the powerful evidence of Defendant's guilt, including particularly the strong identification made by the victim of the robbery, the application

-19-

of this test persuades us without doubt that the error was harmless and accordingly Defendant's conviction should not be disturbed.

## III.      Remaining Contentions

We find no merit to Defendant's remaining arguments. The lineup in which Bolaños identified Defendant was reasonable, Valeria's in-court identification was proper, and the evidence was more than sufficient to support the conviction.

### Conclusion

The judgment of the district court is AFFIRMED.