# United States Court of Appeals
## For the First Circuit

No. 03-1069
No. 03-1070

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS B. FORNIA-CASTILLO,

Defendant, Appellant.


APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gene Carter, <u>Senior U.S. District Judge</u>[*]
Hon. Juan M. Pérez-Giménez, <u>U.S. District Judge</u>]


Before

Selya, <u>Circuit Judge</u>,
Coffin, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.


<u>G. Richard Strafer</u>, with whom <u>Luis Fornia-Castillo,</u> pro se
ipso, was on brief, for appellant.
<u>Edwin O. Vázquez-Berrios</u>, Assistant United States Attorney,
with whom <u>H.S. Garcia</u>, United States Attorney, and <u>Sonia I. Torres-
Pabón</u>, Assistant United States Attorney, were on brief, for
appellee.


May 27, 2005


[*]Of the District of Maine, sitting by designation.

**LIPEZ, Circuit Judge.** Defendant-appellant Luis B. Fornia-Castillo was indicted, tried, and convicted on a single count of conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. He then sought to dismiss, on double jeopardy grounds, a second indictment charging him with another count of conspiracy under 21 U.S.C. § 846 and four substantive counts of possession with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and aiding and abetting others in those offenses in violation of 18 U.S.C. § 2. After the government dismissed the second conspiracy count, the court denied Fornia's motion to dismiss the second indictment. Fornia then pled guilty to each of the four remaining substantive offense counts, expressly reserving his right to appeal those convictions on double jeopardy grounds. Fornia was sentenced in separate hearings to consecutive terms of 210 months' imprisonment for the conspiracy conviction and 365 months' imprisonment for the four substantive counts (to run concurrently to each other), for a total term of imprisonment of approximately 48 years. Fornia appeals his convictions and sentences.

With respect to his conspiracy conviction, Fornia argues that: (1) the trial court erroneously denied his motion to suppress evidence obtained in violation of his Fourth Amendment right to protection against unreasonable searches and seizures and his Fifth

Amendment right to protection against self-incrimination; (2) his pre-trial counsel rendered constitutionally defective representation at his suppression hearing in violation of his Sixth Amendment right to effective assistance of counsel; and (3) the government violated his Fifth Amendment right to indictment by a grand jury by constructively amending the indictment after its presentment to the grand jury. With respect to his pleas to the substantive offenses, Fornia argues that the prosecution was barred by the Double Jeopardy Clause of the Fifth Amendment because the government failed to exercise due diligence either by seeking a superseding indictment to the initial conspiracy charge or by promptly joining both cases for prosecution.[1] Fornia also assigns numerous errors to his sentences, including the claim that the court imposed mandatory sentence enhancements in each case based solely on judicial fact-finding, thereby increasing the maximum sentence otherwise authorized by jury-found or admitted facts in violation of United States v. Booker, 543 U.S. ___, 125 S. Ct. 738 (2005).

---

[1]Fornia raises a number of other claims with respect to his convictions. We have considered them and find them to be either without merit or waived by his guilty plea in the second case, in which he reserved only his right to appeal on double jeopardy grounds. See United States v. Rodriguez-Castillo, 350 F.3d 1, 3-4 (1st Cir. 2003) ("A defendant who subscribes an unconditional guilty plea is deemed to have waived virtually all claims arising out of garden-variety errors that may have antedated the plea.").

After careful consideration of each of Fornia's claims, tested against the record on appeal, we affirm Fornia's convictions.  Because we are not "convinced that a lower sentence would not have been imposed" under a post-<u>Booker</u>, non-mandatory Guidelines regime, <u>United States</u> v. <u>Vázquez-Rivera</u>, No. 02-1818, 2005 WL 1163672, at *10, ___ F.3d ___ (1st Cir. May 18, 2005), we vacate all of the sentences and remand both cases for resentencing.

## I.  BACKGROUND

We recount the facts, consistent with record support, in the light most favorable to the jury's guilty verdict on the conspiracy charge, <u>United States</u> v. <u>Gonzalez-Maldonado</u>, 115 F.3d 9, 12 (1st Cir. 1997), and as found by the district court after a suppression hearing, <u>United States</u> v. <u>Ngai Man Lee</u>, 317 F.3d 26, 30 (1st Cir. 2003).  We reserve further details for our analysis of Fornia's individual claims.

On the afternoon of September 9, 1999, Drug Enforcement Administration ("DEA") Task Force agents conducting visual surveillance of suspected drug conspirators outside a furniture store witnessed several people entering and exiting the store with small boxes and bags that the agents had reason to believe contained illegal drugs or drug proceeds.[2]  Later that day, two

---

[2]The agents' suspicions were based in part on wiretap surveillance of individuals with known histories of involvement in drug activity and the seizure of plastic wrapping materials found in the garbage outside the furniture store that tested positive for cocaine residue.

suspects left the store carrying a large bag, which they placed in the trunk of a car. Agents followed the two men as they drove the car from the furniture store to a bakery, where they met a third man unknown to the agents, who was later identified as Fornia. The agents observed the men transferring the contents of the car trunk to the trunk of Fornia's car, and began following Fornia as he drove away from the bakery alone.

At around 7:45 PM, agents instructed a member of the Task Force who was a local police officer in uniform to pull Fornia over under the pretense of investigating a report of a car stolen from a nearby shopping center whose description matched Fornia's car. After identifying Fornia through his driver's license and car registration, the officer obtained Fornia's consent to search the car, including a garbage bag in the trunk, which contained several smaller bags and a shoe box, all filled with large amounts of cash. Once the officer saw the cash, he handcuffed Fornia and frisked him, finding no weapon.[3] While Fornia was handcuffed, the officer signaled for assistance from two local police officers who were not part of the Task Force but who happened to be patrolling the area. Fornia remained handcuffed until another Task Force member arrived on the scene, pretending to be another police officer in charge of

---

[3]As we discuss in Part II.A, the officer also drew his gun in a defensive posture, out of Fornia's sight, as a safety precaution while Fornia opened the bag in the trunk.

security at the shopping center parking lot, and ordered the handcuffs removed.

The newly arrived agent informed Fornia that the money would have to be turned over either to the tax authorities, who would take the cash, deduct a portion, and return the remainder to Fornia by check, or, in the alternative, to the DEA. Fornia stated several times that he would prefer to turn the money over to the tax authorities, observing that their procedure resembled money laundering. Instead, the officers awaited the arrival of DEA agents, all of whom were members of the Task Force investigating the suspected drug conspiracy. When the DEA agents arrived, they told Fornia that he was not under arrest for carrying a large quantity of cash. The agents questioned Fornia about his recent whereabouts and asked where he was going with the large amount of cash. Fornia did not mention that he had been at the bakery, but replied that he had bought coffee at the shopping center and that he was bringing the money to his mother-in-law's house to be stored. The agents then seized the money and asked Fornia to go to the DEA office for further questioning. Fornia agreed and drove his own car to the DEA office, where he answered additional questions. Fornia was then given a receipt for the cash and left the DEA office.

On April 26, 2000, a federal grand jury returned a sealed indictment ("I96") charging 26 named individuals, including Fornia,

-6-

and unknown co-conspirators with a solitary count of conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846 during a time period beginning "not later than the summer of 1997" and continuing through the date of the indictment. The indictment assigned each named individual a number and described his or her alleged role within the conspiracy. Fornia, #21, was included among #16-23 as "transporters of drug[s] or money."[4] The indictment also alleged 74 overt acts, "among others," committed in furtherance of the conspiracy. Fornia's name appeared only once in the list of overt acts, in paragraph 50, which alleged that "[o]n September 9, 1999, (2) Fernando TORRES-Fernandez and (20) Osvaldo VILLEGAS-Rivera delivered to (21) Luis FORNIA-Castillo approximately Two Hundred Eighty-One Thousand and Nine Hundred Twenty-Six Dollars ($281,926.00) of drug proceeds" (emphasis omitted).

The indictment was unsealed on May 1, 2000, and Fornia was arrested on a warrant that day. He was later released on bail. On December 27, 2000, Fornia moved to suppress the evidence, including his statements, obtained as a result of the September 9, 1999 stop and search of his car and his subsequent interview at the DEA office. After an evidentiary hearing before Judge Casellas on

---

[4]The other named individuals were described in order as "head and owner drug point" (#1), "sources of supply" (#2-4), "supervisors/managers" (#5-7), "assistants" (#8-15), "counter surveillance" (#24), and "preparers and packagers of drugs" (#25-26).

February 5-6, 2001, the motion was denied.[5]  By March 2001, each of Fornia's 25 co-defendants in I96 had pled guilty.

On August 1, 2001, a federal grand jury returned a sealed indictment ("I528") charging 15 named individuals, including Fornia and one other person who had also been indicted in I96,[6] and others unknown, with conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846 during a time period beginning "on or about the end part of 1996" and continuing through the date of the indictment.  As in I96, all of the conduct alleged against Fornia in I528 took place no earlier than "the summer of 1997."  I528 identified Fornia as #1, "owner of drugs."[7]  The indictment also charged Fornia with four additional counts alleging substantive offenses in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), and aiding and abetting others in those offenses in violation of 18 U.S.C. § 2.  The substantive offenses were also

---

[5]Fornia filed a motion to reopen his suppression hearing on January 18, 2002, in order to supplement the record with facts relating to his interrogation at the DEA office.  Judge Hornby (sitting by designation) denied the motion to reopen because "[t]he transcript of the [suppression motion] hearing fully supports the findings that Judge Casellas made" and because he concluded, based on an independent review of the record, that the evidence should not be suppressed.

[6]Osvaldo Villegas-Rivera was named in I96 as #20, a "transporter," and in I528 as #3, a "source[] of supply."

[7]The other named individuals were identified as "sources of supply" (#2-5), "narcotics transporter[]" (#6), "drug distributors in [] their respective distribution area or drug point" (#7-12), and "assistants in receiving and delivering money or drug[s]" (#13-15).

alleged as overt acts #4-6 and #10 committed in furtherance of the conspiracy charged in Count One.

Specifically, Count Two alleged that Fornia, indicted co-conspirators #2 and #6, and an unindicted co-conspirator possessed with intent to distribute approximately 50 kilograms of cocaine "[o]n or about the end part of 1997." Count Three alleged that Fornia, the same indicted co-conspirators, and an unindicted co-conspirator possessed with intent to distribute the same quantity of cocaine "[o]n or about the beginning of 1998." Count Four alleged that Fornia, indicted co-conspirator #3, and an unindicted co-conspirator possessed with intent to distribute approximately 40 kilograms of cocaine "[o]n or about August[] 1999," and Count Five alleged that Fornia and an unindicted co-conspirator possessed with intent to distribute approximately 30 kilograms of cocaine "[o]n or about October[] 1999."[8] Additional overt acts alleged in furtherance of the conspiracy included three instances of drug-related payments, including an expanded version of paragraph 50 of I96 alleging that "[o]n September 9, 1999, . . . OSVALDO VILLEGAS RIVERA[] and an unindicted coconspirator delivered to . . . LUIS B. FORNIA-CASTILLO approximately $281,926.00 of drug proceeds, money related to over[t] acts Nos. 6 and 7 herein" (emphasis omitted).

---

[8]The unindicted co-conspirator in Counts Three, Four, and Five turned out to be Fernando Torres-Fernandez, who was indicted in I96 as co-conspirator #2, and who testified against Fornia at his trial in I96 after pleading guilty.

The money was also related to the facts alleged in support of the substantive offense charged in Count Three.  Fornia was arrested on the second set of charges on August 30, 2001 and held without bail.

On April 15, 2002, more than eight months later and during the week when Fornia's jury trial in I96 was scheduled to begin before Judge Carter (who was sitting by designation), the government moved at a pre-trial status conference, over Fornia's objection, to consolidate I96 and I528 for trial and sentencing.[9] Judge Carter denied the motion, stating: "We are going to try this case."  In a written motion filed the next day upon the court's instruction, the government explained its reasons for seeking joinder and for seeking a second indictment instead of a superseding indictment in I96:[10]

> The counts contained in both indictment[s] could have been joined in the same indictment since they are of the same or similar character pursuant to Fed. R. Crim P. 8(a). However, since [by] August 1, 2001, [the date on which the second indictment was returned,] all the codefendants with the exception of codefendant Luis B. Fornia-Castillo in [I96] had already pled guilty[,] the government elected to file a separate indictment against fourteen (14) additional codefendants in lieu of supersed[ing] the indictment in [I96].

---

[9]The government filed a similar motion in I528, pending before Judge Pérez-Giménez, which was "noticed" on or about April 23, 2002.

[10]The government's motion contained no explanation of why the government did not seek joinder of the cases during the eight-and-a-half-month period between August 1, 2001 and April 15, 2002.

Fornia's trial in I96 began two days later, on April 18, 2002, and continued for five days.  The government's first witness was a member of the DEA Task Force who described the events depicted on a surveillance videotape, including the arrival and departure of suspected co-conspirators at the furniture store on September 9, 1999, the two co-conspirators' rendezvous with Fornia at the bakery, and the subsequent discovery of the bags of cash in Fornia's trunk by investigators during the stop and search of his car.

The government then called an indicted co-conspirator, Fernando Torres-Fernandez, who had pled guilty in I96, as a cooperating witness.  Torres testified that sometime in late 1997, Fornia asked him if he had any contacts at the airport who could assist in shipping cocaine to New York.  According to Torres, he and two other co-conspirators then met with Fornia to arrange a test shipment of 50 kilograms of cocaine to New York.[11]  Torres testified that when the test shipment, which also involved a fifth individual who worked at the local airport, proved successful, the same group of four co-conspirators arranged a second shipment of more than 50 kilograms of cocaine to New York.[12]  The second

[11]This event was also alleged as both a substantive count (Count Two) in I528 and as an overt act in furtherance of the conspiracy (Count One) charged in that indictment.

[12]This event was also alleged as both a substantive count (Count Three) in I528 and as an overt act in furtherance of the conspiracy (Count One) charged in that indictment.

shipment, however, never arrived at its destination, according to Torres, because the airport worker had been killed and the cocaine lost. Torres testified that the four co-conspirators had gone to the airport several times to try to find the killer.

During Torres' testimony, Fornia's counsel objected several times on hearsay grounds to Torres' reports of statements made by other alleged co-conspirators. After one such objection, the court took judicial notice of the indictment in I528, which was pending before Judge Pérez-Giménez. Because the events Torres described were alleged only in I528, and the co-conspirators to whom Torres referred were indicted only in I528, the court asked the government whether it could show that the co-conspirators were also participants in the conspiracy charged in I96 for purposes of admitting their hearsay statements. The court then asked: "Why have you indicted in two separate indictments, alleging in the indictment all of these transactions in case number 528, and now you are proving those acts and transactions in a separate case, this one bearing number 96. I don't understand what you are trying to do." The government responded that "at the time [I96 and I528] were indicted, they were separate conspirac[ies]."[13] The court

_____

[13]As we have noted, the government had earlier acknowledged in its motion to consolidate the cases for trial and sentencing that while it had obtained separate indictments, I96 and I528 were "of the same or similar character pursuant to Fed. R. Crim P. 8(a)." The government did not specify the features that made the two conspiracies "similar." According to the indictments, the conspiracies in I96 and I528 involved overlapping time periods,

-12-

warned, "You can't convict the same defendant two times [for the same conspiracy]."  The court then permitted the government to proceed with its direct examination of Torres, advising the government that it would not admit co-conspirator hearsay "until you tell me that you can connect those co-conspirators to this conspiracy and not just to the other [one in I528]."

Torres next testified that on September 9, 1999, he had collected money from several people in order to pay Fornia for about 40 kilograms of cocaine Torres had purchased from him at a price of $13,000 per kilogram.  Torres testified that the cash seized from Fornia later that same day represented partial payment for the drugs after successful resale.[14]  Torres also identified a paper bag and a shoe box that had been used to hold the cash, and

_____

overlapping participants, and the same objective of distributing and "possess[ing] with intent to distribute" cocaine "for significant financial gain or profit."  See United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (determination whether conspiracies are separate depends on totality of the circumstances, including factors such as existence of a common goal, interdependence among participants, and degree to which participants overlap); United States v. Morris, 99 F.3d 476, 480 (1st Cir. 1996) (using "five-part test for determining whether two conspiracies are synonymous for double jeopardy purposes," which inquires whether conspiracies "took place contemporaneously (or nearly so)," "involved essentially the same personnel," "occurred at much the same places," are proven by the same evidence, and "are premised" on the same statutory provision).

[14]Fornia's receipt of drug proceeds from Torres and a co-conspirator indicted in both I96 and I528 constituted the only overt act alleged against him in I96.  The same incident was also alleged as both a substantive count (Count Four) in I528 and as an overt act in furtherance of the conspiracy (Count One) charged in that indictment.

-13-

identified his handwriting on the containers recording the amount of cash held in each.  Torres went on to state that on September 10, 1999, Fornia had informed him that the cash had been seized by the DEA the previous day, but that Fornia planned to recover the cash through a suppression motion or by characterizing the money as proceeds from his legal motorcycle business.  Torres then described new installment payment procedures Fornia devised for receiving future payments in order to avoid the possibility of any additional seizures of large amounts of cash.  Finally, Torres described one additional incident that took place after September 9, 1999, in which Fornia supplied him with about 30 kilograms of cocaine.[15]

After the government rested its case, Fornia moved for an acquittal.  His counsel stated that

> because this case . . . involved a conspiratorial time period that would overlap with [I528], it appears that the evidence that has been brought here is partially from [I528] and . . . because of that, I don't know how we can decide whether this particular conspiracy has been set forth with all of the elements.

The court asked the government how, in the event Fornia was convicted in I96, he would "prove[] in the other court that he has already been convicted of the same conduct that he is charged with [in I528]?"  In response, the government continued to assert that the conspiracy alleged in I528 was different from the one for which

---

[15]This incident was also alleged as both a substantive count (Count Five) in I528 and as an overt act in furtherance of the conspiracy (Count One) charged in that indictment.

-14-

Fornia was being tried in I96. Eventually, however, the government represented that it would request dismissal of the conspiracy count against Fornia in I528.

On April 24, 2002, the jury found Fornia guilty of conspiracy and found that the quantity of cocaine involved in the offense exceeded five kilograms. On April 26, 2002, Fornia moved for a new trial alleging that "the government's failure to provide required pretrial disclosure materially prejudiced [his] right to a fair trial" and that "by falsely indicting and prosecuting [Fornia] for two conspiracies when it knew there was only one, the government deprived [him] of a fair trial." On June 6, 2002, Fornia also moved in I96 to "confirm consolidation" of his cases on the ground that, inter alia, they involved the same alleged conspiracy. The government opposed Fornia's motion to confirm consolidation of the cases, arguing that: (1) consolidation had already been denied; (2) "no substantial public interest [would] be promoted" by consolidation "[a]t this stage of the proceedings"; and (3) Fornia was estopped from seeking consolidation or had waived the claim because he had opposed the government's earlier motion, filed on the eve of trial, to consolidate the cases. On June 25, 2002, Judge Carter denied both Fornia's motion for a new trial and his motion to confirm consolidation of the cases, noting that any double jeopardy concerns could adequately be addressed by Judge Pérez-Giménez in I528.

-15-

On July 1, 2002, Fornia filed a motion to dismiss I528 on double jeopardy grounds. As promised, the government dismissed the conspiracy count against Fornia in I528 on July 3, 2002. Fornia then moved in I528 for a change of plea.[16] At the change-of-plea hearing on July 15, 2002, Judge Pérez-Giménez denied Fornia's motion to dismiss I528. Fornia then pled guilty to the four remaining counts charging him with substantive drug offenses. Although Fornia did not enter into a plea agreement with the government, he expressly reserved the right to appeal his conviction in I528 on double jeopardy grounds, citing Menna v. New York, 423 U.S. 61, 62-63 (1975) (per curiam) (guilty plea does not automatically waive double jeopardy claim).

On October 8, 2002, Judge Carter recused himself from sentencing, and the case was reassigned to Judge Pérez-Giménez. Fornia moved in I528 to consolidate both cases for sentencing on October 25, 2002, but Judge Pérez-Giménez denied the motion. On the morning of December 5, 2002, Judge Pérez-Giménez sentenced Fornia in I96 to 210 months' imprisonment. That afternoon, in a separate sentencing hearing, the court sentenced Fornia in I528 to 365 months' imprisonment to run concurrently as to the four substantive counts, but consecutive to the sentence in I96. Fornia timely appealed his convictions and his sentences.

---

[16]By July 2, 2002, each of Fornia's 14 co-defendants in I528 had also pled guilty.

## II. I96 CONSPIRACY CONVICTION

**A.        Suppression of Evidence**

1.        Validity of Consent to Search

We construe Fornia's Fourth Amendment claim, which he raises in a pro se brief, as a renewal of his challenge to the voluntariness of his consent to the search of the bag in his car trunk.  See United States v. Weidul, 325 F.3d 50, 53 (1st Cir. 2003) (consent to a warrantless search "must be voluntary to be valid").  Fornia alleges that his consent was invalid because it was coerced by the police officer's drawing of his gun after Fornia opened the car trunk, requiring suppression of the bags of cash contained within the larger bag in the trunk.  "Typically, whether consent is voluntary turns on questions of fact, determinable from the totality of the circumstances.  For that reason, a finding of voluntary consent (other than one based on an erroneous legal standard) is reviewable only for clear error, and the trial court's credibility determinations ordinarily must be respected."  United States v. Romain, 393 F.3d 63, 69 (1st Cir. 2004) (citations omitted).

During the suppression hearing, Officer Alverio, the police officer who initially stopped Fornia, testified that after Fornia consented to a search of the car and opened the trunk to reveal a large bag, he asked Fornia if he would mind opening the bag.  When Fornia began to open the bag, Officer Alverio testified

that he drew his gun in a "defensive position" -- out of Fornia's visual range and pointing at the ground -- because it was too dark for him to be able to see whether the trunk contained any weapons. The district court determined that Officer Alverio "provided credible undisputed testimony that Fornia voluntarily agreed to allow him to search the vehicle and to examine the trunk."[17] The court specifically found that the officer "kept [the gun] out of Fornia's view[] and at his side, and placed it back in his holster when Fornia stepped away from the trunk, all of which were confirmed by the [surveillance] video" played during the hearing. The court further found that "the video shows Fornia willingly reach[ing] in to the open trunk of the vehicle and open[ing] the bags containing the money."

Because "the evidence presented at the suppression hearing fairly supports" the district court's factual findings, United States v. Laine, 270 F.3d 71, 75 (1st Cir. 2001), the district court committed no clear error in determining that Fornia's consent to the search of the car trunk was valid. Based

---

[17]Fornia maintains on appeal that, as depicted on the video, he looked back at Officer Alverio before opening the bag, and that he saw the gun at that moment and felt he had no choice but to continue opening the bag. Fornia did not testify during the suppression hearing in order to present his version of events. In all events, "a district court's choice between two plausible competing interpretations of the facts cannot be clearly erroneous." Weidul, 325 F.3d at 53.

on those findings, the court properly denied Fornia's motion to suppress the evidence obtained during the stop.

### 2. *Miranda* Claim

Fornia argues that the statements he made during his entire encounter with the Task Force agents, including those made at the DEA office, should have been suppressed because he was subjected to custodial interrogation without first being advised of his *Miranda* rights, in violation of his Fifth Amendment right to protection against self-incrimination. *See* Dickerson v. United States, 530 U.S. 428, 435 (2000) (failure to give required *Miranda* warnings amounts to Fifth Amendment violation).[18] "*Miranda* warnings must be given before a suspect is subjected to custodial interrogation." United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996). By contrast, "[a]s a general rule, *Terry* stops do not implicate the requirements of *Miranda*." United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986).[19] This is so "because '*Terry*

---

[18]*Miranda* warnings inform a suspect that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Dickerson v. United States, 530 U.S. 428, 435 (2000) (quoting Miranda v. Arizona, 384 U.S. 436, 479 (1966)).

[19]Pursuant to Terry v. Ohio, a warrantless investigatory stop comports with the Fourth Amendment's prohibition on unreasonable searches and seizures if it is justified by more than an "inarticulate hunch[]" and is "reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. 1, 22, 20 (1968).

stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings.'" Id. (quoting United States v. Bautista, 684 F.2d 1286, 1291 (9th Cir. 1982)). A valid investigatory stop may nevertheless escalate into custody, thereby triggering the need for Miranda warnings, where the totality of the circumstances shows that a reasonable person would understand that he was being held to "the degree associated with a formal arrest," Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam) (internal quotation marks omitted). Relevant factors bearing on whether an investigatory stop has evolved into a de facto arrest include "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura, 85 F.3d at 711 (internal quotation marks omitted). While we review the court's factual findings for clear error, the ultimate conclusion whether a seizure is a de facto arrest "qualifies for independent review" because it presents a "mixed question of law and fact." United States v. Trueber, 238 F.3d 79, 91, 93 (1st Cir. 2001) (quoting Thompson v. Keohane, 516 U.S. 99, 113 (1995)).

During the suppression hearing, Officer Alverio testified that once he saw the large quantity of cash contained in the bags

in Fornia's car trunk, he re-holstered his weapon and handcuffed and frisked Fornia because he was the sole law enforcement officer on the scene, and, in his personal experience, people who may be traveling with large quantities of drug proceeds may also be armed or may travel with armed escorts. Officer Alverio explained that he did not remove the handcuffs even after the local police officers arrived on the scene to assist him because he did not know the officers.

Fornia argues that the totality of the circumstances establishes that the stop of his car, while initially a valid investigatory stop, escalated into a de facto arrest triggering the need for Miranda warnings. Fornia maintains that the combination of the officer's display of a gun, his use of handcuffs and a pat-down search, and his explanation that he was investigating a car theft would have led a reasonable person to believe he was effectively under arrest.[20] In particular, Fornia argues that he was subjected to custodial interrogation because Officer Alverio questioned him while he was handcuffed. Indeed, Officer Alverio testified during the suppression hearing that he asked Fornia where the money in his trunk had come from while Fornia was handcuffed, and that Fornia responded that the money was from his motorcycle

_____

[20]At the suppression hearing, Officer Alverio himself used the word "arrest" to describe his restraint of Fornia during the stop of his car. However, Officer Alverio clarified that he restrained Fornia only for safety purposes and not because he was arresting Fornia for a crime.

-21-

business.  While the government did not introduce this particular statement at trial, Fornia maintains that the statements he made after the handcuffs were removed in response to questioning by other Task Force agents should have been suppressed because they were derived from the same Miranda violation.  See United States v. Byram, 145 F.3d 405, 409-10 (1st Cir. 1998) ("where the Miranda violation is not merely technical, where there is a substantial nexus between the violation and the second statement, and where the second statement is not itself preceded by an adequate Miranda warning," suppression of subsequent voluntary statements may be warranted).

The district court concluded that Fornia was not subjected to custodial interrogation at any time during the stop and therefore that no Miranda violation occurred.  The court recognized "two arguably coercive facts" in support of Fornia's Miranda violation claims: Officer Alverio's drawing of his gun and his use of handcuffs.  As the court correctly noted, however, neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest. Trueber, 238 F.3d at 94 (officer's drawing of weapon while asking suspected narcotics trafficker to step out of vehicle at night does not transform entire investigatory stop into de facto arrest); United States v. Acosta-Colon, 157 F.3d 9, 18 (1st Cir. 1998) (the "use of handcuffs in the course of an investigatory stop does not

automatically convert the encounter into a de facto arrest").  As the court had previously found, Officer Alverio briefly drew his weapon out of Fornia's view and for defensive purposes only.  Similarly, based on Officer Alverio's testimony, the district court found that "reasonable safety concerns permeated the [officer's] decision to use [handcuffs]."

While an officer's drawing of his gun and use of handcuffs might in some situations weigh more heavily in favor of a finding that a detention has escalated into a de facto arrest, the district court found that numerous other factors weighed against such a determination in Fornia's case.  Specifically, the court observed that the stop took place at the side of "a busy public street with a heavy volume of traffic," and that, initially, Officer Alverio "was the only officer on the scene."  In addition, the court found that "the handcuffs were removed when other surveillance team members arrived, and only remained on [Fornia] for ten or fifteen minutes."  Finally, the court noted that "the interaction between the . . . officers and Fornia was not confrontational or bellicose."

These factual findings were not clearly erroneous. Based on these findings, the court supportably came to the ultimate conclusion that Fornia's detention was a valid investigatory stop that did not require Miranda warnings.  While a reasonable person in Fornia's situation would certainly have understood that he was

under investigation for a crime, the stop, given the facts as found by the district court, "lacked the coercive element necessary to convert it into something more draconian," based on the totality of the circumstances. Ngai Man Lee, 317 F.3d at 32. The district court thus properly denied Fornia's motion to suppress his statements on the ground that they were obtained as a result of a violation of his Fifth Amendment right to protection against self-incrimination.

**B.        Ineffective Assistance of Counsel**

In his pro se brief, Fornia claims that he was deprived of his Sixth Amendment right to effective assistance of counsel at his suppression hearing. Under the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), to establish such a violation, "a defendant must show that counsel performed unreasonably and that prejudice resulted therefrom." United States v. Mena-Robles, 4 F.3d 1026, 1034 (1st Cir. 1993). Fornia alleges that his pre-trial counsel performed deficiently by denying him the opportunity to exercise his constitutional right to testify at his suppression hearing, which resulted in the denial of his motion to suppress evidence.[21]

---

[21]Fornia specifically notes that if he had been able to testify at the suppression hearing, he would have described the conversation he had with the two men he met at the bakery, which was recorded without sound on the government's surveillance videotape.

-24-

The record on appeal, however, is devoid of facts relating to Fornia's interactions with counsel, including whether counsel informed Fornia of his right to testify at his suppression hearing, informed him of the constitutional nature of that right, or somehow coerced him into forgoing the exercise of that right. See Lema v. United States, 987 F.2d 48, 52-53 (1st Cir. 1993) (discussing considerations for determining whether defense counsel coerced or merely advised client regarding decision whether to testify). Because the record is insufficiently developed to permit "reasoned consideration of the ineffective assistance claim," United States v. Glenn, 389 F.3d 283, 287 (1st Cir. 2004), Fornia may raise such a claim only on collateral attack in a proceeding pursuant to 28 U.S.C. § 2255. See United States v. Genao, 281 F.3d 305, 313 (1st Cir. 2002). We therefore dismiss his ineffective assistance of counsel claim without prejudice to the filing of a § 2255 petition.

## C.        Constructive Amendment/Prejudicial Variance

Fornia alleges that the government constructively amended the indictment in I96 by introducing evidence of the conspiracy alleged in I528 to prove the conspiracy charged in I96 -- in effect, trying him for an offense other than that alleged in I96 -- in violation of his Fifth Amendment right to presentment of charges to a grand jury. The government argues that Fornia has forfeited his claim of constructive amendment through failure to object to

-25-

the introduction of evidence on that ground or to seek a continuance or mistrial below. As we have explained, however, after the government rested its case, Fornia's counsel moved for an acquittal on the ground that the conspiracy the government had attempted to prove in I96 was indistinguishable from that charged in I528 and that the evidence was therefore insufficient to prove the conspiracy charged in I96. In his motion for a new trial, Fornia also argued that he had been prejudiced at trial by the government's failure to clarify which of the two charged conspiracies it was attempting to prove in I96. Fornia's claim is thus preserved.

The Presentment Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury" (with exceptions not relevant to this case). Accordingly, "after an indictment has been returned[,] its charges may not be broadened through amendment except by the grand jury itself." Stirone v. United States, 361 U.S. 212, 215-16 (1960) (citing Ex Parte Bain, 121 U.S. 1 (1887)). An indictment has been constructively amended in violation of the Presentment Clause "when the charging terms of the indictment are altered, either literally or in effect, by prosecution or court after the grand jury has last passed upon them." United States v. Fisher, 3 F.3d 456, 462 (1st Cir. 1993) (internal quotation marks and citation omitted). Such

-26-

an amendment may occur through the "admission of evidence of an offense not charged by the grand jury." United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985).

Fornia argues specifically that the government tried him for the offense of participating in a conspiracy in which he was an "owner of drugs," as charged in I528, as opposed to the conspiracy charged in I96, in which he was identified as a "transporter[] of drug[s] or money" and another individual was identified as the only "head and owner drug point." However, the statutory offense charged against Fornia in I96, and the offense the government proved at trial, was conspiracy to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846. Role in the conspiracy is not an element of that offense. Thus, Fornia's claim does not involve an alleged constructive amendment of I96 to include "an offense not charged by the grand jury," Dunn, 758 F.2d at 35, but rather an alleged variance from the indictment, which "occurs when the charging terms remain unchanged but when the facts proved at trial are different from those alleged in the indictment," Fisher, 3 F.3d at 463.

Though related, claims of constructive amendment and prejudicial variance differ in at least one important respect. "A constructive amendment is considered prejudicial per se and grounds for reversal of a conviction." Id. By contrast, "[v]ariance is grounds for reversal only if it affected the defendant's

substantial rights." Id. (internal quotation marks omitted). In short, "[s]o long as the statutory violation remains the same, the jury can convict even if the facts found are somewhat different than those charged -- so long as the difference does not cause unfair prejudice." United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995).

Fornia argues that the government's proof at trial impermissibly varied from the allegations in I96 by establishing that his role in the alleged conspiracy was not that of a "transporter[] of drug[s] or money" in someone else's drug distribution operation, but that of an "owner of drugs," which Fornia sold to Torres, who, in turn, sold them to co-conspirators indicted in I96. Indeed, while the government introduced evidence that Fornia literally "transport[ed]" drug proceeds in the trunk of his car, the government introduced no evidence whatsoever that Fornia "transport[ed]" the cash in the trunk of his car to or for anyone else. Rather, Torres testified that it was he who distributed the cocaine he purchased from Fornia to the individual identified in the indictment as #1, "head and owner drug point," and other indicted co-conspirators. Torres also testified that he then collected cash from other co-conspirators and delivered it to Fornia as partial payment for the cocaine Fornia had supplied. Because the government's evidence of Fornia's role in the conspiracy differed from the role of a "transporter[] of drug[s] or

money" in a conspiracy in which another individual was identified as the "head and owner drug point," as alleged in the indictment in I96, there was a variance between the government's proof at trial and the charge alleged in the indictment.

Nevertheless, Fornia fails to establish any prejudice resulting from the variance. The question "whether a variance affected a defendant's substantial rights" is subject to de novo review. United States v. Wihbey, 75 F.3d 761, 774 (1st Cir. 1996). Fornia points out that the grand jury that returned the indictment in I96 never had an opportunity to assess the government's evidence that he was an owner of drugs, since the government acknowledges that it discovered the facts alleged in I528 only after I96 had already been returned.[22] Fornia's argument misapprehends the nature of the substantial rights protected by the prohibition on prejudicial variance from an indictment, namely, the rights to "have sufficient knowledge of the charge against [one] in order to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense." United States v. Tormos-Vega, 959 F.2d 1103, 1115 (1st Cir. 1992).[23]

---

[22]Of course, a different grand jury did indict Fornia for conspiracy based on those facts in I528.

[23]Another purpose for the protection against variance from an indictment, not at issue here, is to prevent prejudicial spillover in cases involving multiple co-defendants. Tormos-Vega, 959 F.2d at 1115.

-29-

The record shows that Fornia had ample notice of and ample opportunity to prepare to meet the government's evidence before trial. "The government need not recite all of its evidence in the indictment, nor is it limited at trial to the overt acts listed in the indictment." United States v. Innamorati, 996 F.2d 456, 477 (1st Cir. 1993). Here, however, prior to trial, the government disclosed its intention to introduce evidence in I96 relating to Fornia's ownership of drugs as alleged in I528.[24] That evidence was relevant to central factual disputes in I96, for example, whether the money in Fornia's trunk represented drug proceeds (as distinct from legal business proceeds), and whether Fornia shared an interest in the sales and distribution activities of others. Further, Fornia's particular role in the conspiracy alleged in I96 was unrelated to his defense theory; rather, Fornia was well aware that his "central defense [in I96] needed to be that he was not part of [the] organization -- as a [transporter of drug

---

[24]Pursuant to Fed. R. Evid. 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes . . . provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial." Prior to trial, the government argued both that it had complied with the disclosure requirements of Fed. R. Evid. 404(b) and that in any event the evidence of acts alleged in I528 did not fall within the scope of that rule because the "crimes, wrongs, or acts" of which it sought to introduce evidence were not "other crimes, wrongs or acts" but were intrinsic to the crime of conspiracy to distribute cocaine charged in I96.

proceeds, owner of drugs], or in any other capacity." United States v. Alicea-Cardoza, 132 F.3d 1, 6 (1st Cir. 1997) (no impermissible variance where defendant was indicted "for being a conspirator/triggerman but the evidence proved him a conspirator/runner"). Accordingly, Fornia was not misled by the government's evidence at trial to "defend himself on the wrong grounds." Id. Fornia was thus able to "prepare an effective defense and avoid surprise at trial." Tormos-Vega, 959 F.2d at 1115.

Finally, the trial court detected the potential for prejudice to Fornia's ability to avoid a successive prosecution for the same offense based on the government's introduction of evidence relating to the charges in I528 -- including evidence of Fornia's role in that conspiracy -- to prove the conspiracy charged in I96. However, as we discuss below in Part III, any such prejudice was cured by the government's dismissal of the conspiracy count in I528. Because the variance failed to affect Fornia's substantial rights, we reject his challenge to his conviction in I96 on the ground of constructive amendment or prejudicial variance.

### III. I528 DOUBLE JEOPARDY CLAIM

Fornia appeals the denial of his motion to dismiss the indictment in I528 on double jeopardy grounds. The government argues that Fornia has waived his double jeopardy claim by objecting to its motion to consolidate the cases for trial, thereby

"elect[ing] to have the two offenses tried separately and persuad[ing] the trial court to honor his election." Jeffers v. United States, 432 U.S. 127, 152 (1977) (plurality op.). While the record is silent on Fornia's reasons for objecting to the government's motion, which was made during a pre-trial conference three days before Fornia's trial began in I96, Fornia maintains on appeal that his objection was based solely on his inability to prepare to try both cases on such short notice rather than as an attempt to "persuade" the trial court of his "election" to face separate trials. Id. The government points out that Fornia could have sought a continuance. In denying the government's motion, however, Judge Carter, who was sitting in Puerto Rico by special designation for a limited period of time, clearly announced his intention "to try this case," meaning the I96 indictment. Under these circumstances, we treat Fornia's claim as preserved.[25]

The availability of double jeopardy protection is a constitutional question reviewable de novo. United States v. Lanoue, 137 F.3d 656, 661 (1st Cir. 1998). Under the Fifth Amendment, no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." Among the purposes for double jeopardy protection is the prevention of "repeated

---

[25]As we have noted, Fornia also expressly reserved the right to appeal his conviction in I528 on double jeopardy grounds, despite his guilty plea, pursuant to Menna v. New York, 423 U.S. 61, 62 (1975) (per curiam) (double jeopardy claim not automatically waived by guilty plea).

prosecutions for the same offense," Oregon v. Kennedy, 456 U.S. 667, 671 (1982), pursuant to "a constitutional policy of finality for the defendant's benefit," United States v. Jorn, 400 U.S. 470, 479 (1971) (plurality op.).

Fornia's double jeopardy claim is narrow in scope. While the Double Jeopardy Clause protects against "the danger that, in conspiracy cases, the government might . . . partition[] a single conspiracy into separate prosecutions" by prohibiting successive prosecutions for conspiracies with identical features, United States v. Morris, 99 F.3d 476, 480 (1st Cir. 1996), Fornia ultimately faced only one conspiracy prosecution because the second conspiracy count against him was eventually dismissed.[26] Fornia therefore does not allege that he was prosecuted twice for the same violation of the same statute, 21 U.S.C. § 846.

Nor does Fornia make the futile argument that he could not be successively prosecuted in I528 for substantive drug offenses that were the objects of a drug conspiracy for which Fornia had already been prosecuted in I96. Under the traditional test announced in Blockburger v. United States, 284 U.S. 299, 304

---

[26]As we have discussed, Judge Carter expressed concerns about double jeopardy during Fornia's trial in I96 after the government introduced evidence of the conspiracy alleged in Count One of I528. After arguing that the conspiracy charged in I528 was different from that in I96, the government later represented that it would seek to dismiss the conspiracy count in I528. It so moved in July 2002, after Fornia moved to dismiss I528 on double jeopardy grounds.

-33-

(1932), "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Fornia's sequential prosecutions under different statutes fully satisfy the Blockburger test. "In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy." United States v. Shabani, 513 U.S. 10, 15 (1994). Conversely, no agreement need be proven to secure a conviction for a substantive drug offense under 21 U.S.C. § 841(a)(1). Indeed, it has long been established that "conspiracy to commit a crime is not the same offense as the substantive crime for double jeopardy purposes," Lanoue, 137 F.3d at 662, because "the agreement to do the act is distinct from the [completed] act itself," United States v. Felix, 503 U.S. 378, 390-91 (1992) (internal quotation marks omitted) (adhering to line of cases holding that separate prosecutions for conspiracy and for underlying substantive offenses do not violate the Double Jeopardy Clause).

Fornia attempts to reach shelter under the Double Jeopardy Clause by a different route. He points out that the Supreme Court has suggested that even where a successive prosecution would otherwise be barred under the Blockburger test, such a prosecution may nevertheless be permissible under the Double

Jeopardy Clause where "the additional facts necessary to sustain [a subsequent] charge ha[d] not [yet] occurred or ha[d] not [yet] been discovered despite the exercise of due diligence" at the time of the first prosecution. Brown v. Ohio, 432 U.S. 161, 169 n.7 (1977). Fornia asks us to fashion a new rule by holding that the Double Jeopardy Clause also prohibits successive prosecutions that would not otherwise be barred under the Blockburger test where, in the exercise of due diligence, the government could have brought the prosecutions in the same proceeding. See Fed R. Crim. P. 8(a) (permitting joinder of charges against a defendant in the same indictment "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan").

Fornia's proposed rule is a barely disguised attempt to resurrect the "same transaction" test for determining when successive prosecutions are barred by the Double Jeopardy Clause. Such a test, "which would require the Government to try together all offenses (regardless of the differences in the statutes) based on one event," has been "consistently rejected by the [Supreme] Court." United States v. Dixon, 509 U.S. 688, 709 n.14 (1993). Instead, "the performance of a Blockburger analysis completes the judicial task in a successive prosecution case." Morris, 99 F.3d at 480. Even where, as in Fornia's cases, prosecutions for

-35-

different offenses may be suitable for joinder, successive prosecutions are permitted under the Double Jeopardy Clause so long as the offenses pass the <u>Blockburger</u> test, with its "focus[] on the statutory elements of each offense."  <u>United States</u> v. <u>Colon-Osorio</u>, 10 F.3d 41, 43 (1st Cir. 1993).  We therefore reject Fornia's claim that his prosecution in I528 was barred by the Double Jeopardy Clause solely because the government, in the exercise of due diligence, could have brought the charges in a superseding indictment or could have more promptly moved to consolidate I96 and I528 for trial.[27]

## IV. SENTENCING IN I96 AND I528

**A.        Background**

Under 21 U.S.C. §§ 846 and 841(b)(1)(A), Fornia was subject to a statutory mandatory minimum sentence of 10 years' imprisonment and a maximum term of life imprisonment for each of his convictions, given the jury's finding in I96 and his admissions in his guilty pleas in I528 that the quantity of cocaine involved

---

[27]Fornia's reliance on two decisions by our sister circuits that allegedly adopt such a rule is misplaced.  <u>See</u> <u>Rashad</u> v. <u>Burt</u>, 108 F.3d 677 (6th Cir. 1997); <u>United States</u> v. <u>Reed</u>, 980 F.2d 1568 (11th Cir. 1993).  Not only are the circumstances of Fornia's sequential prosecutions factually distinguishable, but these cases are of limited applicability even in their originating circuits.  <u>See</u> <u>United States</u> v. <u>Forman</u>, 180 F.3d 766, 770 (6th Cir. 1999) (limiting language in <u>Rashad</u> that may conflict with <u>Dixon</u> to apply only to the specific circumstances present in <u>Rashad</u>); <u>United States</u> v. <u>Maza</u>, 983 F.2d 1004, 1008 n.8 (11th Cir. 1993) (characterizing as dicta language in a case cited in <u>Reed</u> as authority for a due diligence rule imposed by the Double Jeopardy Clause).

in each offense exceeded 5 kilograms.  Under the federal Sentencing

Guidelines, Fornia's sentence in each case was limited to a

narrower Guidelines Sentencing Range ("GSR") based on an assessment

of his Criminal History Category and a total offense level

calculated by identifying a "'base offense level' corresponding to

the crime for which [he was] convicted, as modified by mandatory

'adjustments' which take into account certain aggravating or

mitigating factors."  United States v. Austin, 239 F.3d 1, 5 (1st

Cir. 2001).[28]

We recount the facts pertinent to Fornia's sentencing as

gleaned from "uncontested portions of the presentence investigation

report[s] and the transcript[s] of the sentencing hearing[s]."

United States v. Cloutier, 966 F.2d 24, 25 (1st Cir. 1992).  On the

morning of December 5, 2002, the court held a sentencing hearing in

I96.  The court calculated Fornia's base offense level as 34 for a

drug offense involving 21 kilograms of cocaine.  See U.S.S.G. §

2D1.1(a)(3).  The court arrived at this 21-kilogram figure by

dividing the total amount of drug proceeds seized from Fornia

---

[28]A reviewing court ordinarily "appl[ies] the edition [of the Sentencing Guidelines] in effect at the time of sentencing." United States v. Martin, 363 F.3d 25, 32 n.3 (1st Cir. 2004).  In Fornia's case, that would be the edition that went into effect on November 1, 2002.  For reasons that remain unclear, Fornia's presentence investigation reports were prepared according to the 2000 Guidelines.  The parties have pointed out no differences in the 2000 and 2002 versions of the Guidelines applicable to Fornia, nor have we detected any.  All references to the Guidelines throughout this opinion are thus to the 2002 edition.

($281,926) by the amount Torres testified that he paid Fornia per kilogram of cocaine ($13,000), as recommended in the presentence investigation report ("PSR") for I96.  The court then found that Fornia had been "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive" within the meaning of U.S.S.G. § 3B1.1(b), warranting a three-level upward adjustment to reach a total offense level of 37.  The court declined to impose an upward adjustment sought by the government for the specific offense characteristic of possession of a firearm.  U.S.S.G. § 2D1.1(b)(1).  The court also declined to impose an acceptance of responsibility downward adjustment because Fornia had gone to trial in I96.  See U.S.S.G. § 3E1.1, cmt. n.2 (adjustment for acceptance of responsibility generally unavailable to defendant who "puts the government to its burden of proof at trial by denying the essential factual elements of guilt").  The court then sentenced Fornia to the minimum sentence, 210 months' imprisonment, within the appropriate GSR for an offender in Criminal History Category I (210-262 months), and imposed a fine of $5000 and a five-year term of supervised release.

Later that afternoon, the court held a separate sentencing hearing in I528.  The court determined that the quantity of drugs involved in all conduct relevant to the charged offenses was the sum total of the amounts involved in the four substantive

counts in I528, or 170 kilograms.[29]  Following the recommendation

of the PSR in I528, the court reasoned that "21 of those kilograms

were the subject of the . . . sentence in [I96]" and had already

been accounted for by that sentence.  Accordingly, the court used

the remaining quantity, 149 kilograms, to calculate a base offense

level of 36 in I528.  The court then found that Fornia "was an

organizer or leader of a criminal activity that involved five or

more participants or was otherwise extensive" within the meaning of

U.S.S.G. § 3B1.1(a), warranting a four-level upward adjustment to

reach a total offense level of 40.  The court also found, based on

the government's representation and the description in the PSR

prepared in I528, that two indicted co-conspirators who had pled

guilty in I528 had placed Fornia in possession of a firearm during

a drug-related incident.  The court accordingly imposed a two-level

upward adjustment for the specific offense characteristic of

possession of a firearm during a drug offense, U.S.S.G. §

2D1.1(b)(1), reaching a total offense level of 42.  Because Fornia

pled guilty to the four counts in I528, however, the court imposed

a three-level decrease for acceptance of responsibility, U.S.S.G.

§ 3E1.1(b), lowering the total offense level to 39.  Finally, based

on Fornia's "prior undischarged sentence" imposed that morning in

---

[29]Although Fornia pled guilty to the factual basis for each of
the substantive counts in I528, he admitted only that each count
involved a quantity in excess of five kilograms of cocaine.

I96, the court awarded three criminal history points to place Fornia in Criminal History Category II.  U.S.S.G. § 4A1.1(a).  The court then sentenced Fornia to the maximum sentence, 365 months' imprisonment, within the applicable GSR (292-365 months), to run concurrently as to the four substantive counts, but consecutive to the sentence of 210 months' imprisonment in I96, for a total term of imprisonment in both cases of just under 48 years.[30]  The court also imposed a fine of $250,000 and a five-year term of supervised release to run concurrently with the term of supervised release imposed in I96.  The court declined Fornia's request for a downward departure on the basis of alleged prosecutorial misconduct. Finally, the court determined that no other mitigating circumstances -- neither Fornia's deportability nor his allegations of disparity in his sentence as compared with those of his co-defendants -- warranted a downward departure.

Fornia appeals his sentences on multiple grounds, several of which are interrelated.  Specifically, Fornia argues that: (1) the district court imposed mandatory sentence enhancements based solely on judicially found facts, increasing the sentence in each case beyond the maximum authorized by jury-found or admitted facts

---

[30]Explaining its decision to impose the maximum sentence in the GSR, the court cited Fornia's criminal history, including his conviction in I96 as well as a prior conviction from 1975 that was mentioned in each of his PSRs but which had been excluded from the Criminal History Category calculation in each case pursuant to U.S.S.G. § 4A1.2(e).  The court made no reference to the 1975 conviction during sentencing in I96.

in violation of <u>Booker</u>; (2) the court erred by failing to use the same drug quantity involved in the conspiracy in I96, 21 kilograms, to sentence Fornia on the four substantive counts in I528 because the cases involved related conduct, <u>see</u> U.S.S.G § 1B1.3; (3) the court imposed a consecutive rather than a concurrent term of imprisonment in I528, including role-in-the-offense sentence enhancements based on the same conduct in each case, in violation of Fornia's Fifth Amendment rights to due process and protection against double jeopardy; (4) the court improperly assigned criminal history points on the basis of Fornia's sentence for the conspiracy conviction in I96 to increase his sentence in I528, <u>see</u> U.S.S.G. § 4A1.2; (5) the court improperly denied Fornia's motion to consolidate his cases for sentencing and failed to group the counts in both indictments, <u>see</u> U.S.S.G. §§ 3D1.1-3D1.5 and 5G1.2(b)-(c); (6) the role-in-the-offense sentence enhancement in I96 violates the Presentment Clause of the Fifth Amendment; and (7) the evidence was insufficient to support, by a preponderance of the evidence, the court's imposition of role-in-the-offense enhancements in both I96 and I528, <u>see</u> U.S.S.G. § 3B1.1, and the "specific offense characteristic" adjustment for possession of a firearm in I528, <u>see</u> U.S.S.G. § 2D1.1(b)(1). As we discuss below, our disposition of Fornia's claims of <u>Booker</u> error obviates the need to address his other sentencing claims.

-41-

**B.      Booker Error**

After briefing was completed and oral argument held in this case, the Supreme Court decided Booker, in which the Court precluded, on Sixth Amendment grounds, a sentencing court from imposing a sentence on the basis of judicially found facts that "exceed[s] the maximum authorized by the facts established by a plea of guilty or a jury verdict", Booker, 125 S. Ct. at 756, but "only insofar as the sentence resulted from a mandatory system imposing binding requirements on sentencing judges," United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005).  Because "the mandatory nature of the Guidelines . . . raised constitutional concerns," id., the Court eliminated such concerns by striking the statutory provision that renders the Sentencing Guidelines binding on federal courts, 18 U.S.C. § 3553(b)(1).[31]

Fornia cited Apprendi v. New Jersey, 530 U.S. 466 (2000), in his written objections to the draft PSR in each of his cases as a ground for objection to the imposition of role enhancements or adjustments for possession of a firearm.[32]  We therefore treat his

---

[31]The Court also struck 18 U.S.C. § 3742(e), which authorized appellate courts to engage in de novo review over certain aspects of federal sentencing.  Booker, 125 S. Ct. at 764.  The Court left the remainder of the Act, including the requirement that a sentencing court calculate and consider the sentence recommended by the Guidelines, 18 U.S.C. § 3553(a)(4), untouched.  Antonakopoulos, 399 F.3d at 76.

[32]As we have discussed, the district court imposed role enhancements in both cases, but imposed an upward adjustment for possession of a firearm in I528 only.

claims of Booker error as preserved on appeal and subject to review for harmless error. Antonakopoulos, 399 F.3d at 76.[33] As a result of the Supreme Court's remedial decision, Booker error is established whenever "a defendant's Guidelines sentence was imposed under a mandatory Guidelines system," whether or not the sentencing court relied on judicial fact-finding to increase the sentence beyond the maximum authorized by jury-found or admitted facts. Antonakopoulos, 399 F.3d at 75. Under harmless error review of Booker claims, in order to avoid a remand for resentencing under advisory Guidelines,

> the government has the burden of proving beyond a reasonable doubt that the error did not affect the defendant's substantial rights. That is, we must be convinced that a lower sentence would not have been imposed had the Guidelines been advisory. This is an extremely difficult, but not impossible, standard to meet.

Vázquez-Rivera, 2005 WL 1163672, at *10, ___ F.3d at ___. Where a defendant assails, as a constitutional violation, the imposition of enhancements that bring his sentence above the maximum sentence authorized by jury fact-finding or admitted facts -- a virtual

---

[33]Fornia also raised a claim under Blakely v. Washington, 542 U.S. ___, 124 S. Ct. 2531 (2004), in his reply brief. Because Fornia's claims of Booker error are preserved and therefore subject to harmless error review, no supplemental briefing was invited from or submitted by the parties in the wake of Booker or Antonakopoulos. See Antonakopoulos, 399 F.3d at 83 (permitting parties to submit supplemental briefing on consequences of the panel's decision for unpreserved claims of Booker error). Fornia did, however, file a letter pursuant to Fed. R. App. P. 28(j) apprising the panel of these decisions.

prerequisite for the preservation of a claim of <u>Booker</u> error[34] --
"factual certainty alone" in support of such enhancements "would
not be sufficient to show beyond a reasonable doubt that the judge,
acting under an advisory Guidelines system, would have applied the
same sentence on the basis of those factors."  <u>Id.</u>

Applying this standard to Fornia's sentences, we cannot
conclude with the requisite certainty that the district court would
not have imposed lower sentences in each of his cases under a non-
mandatory Guidelines regime.  As our description of Fornia's
multiple claims of Guidelines error suggests, the Guidelines
sentencing here was complex.  In response, the court imposed the
minimum sentence under the GSR for the conspiracy conviction in
I96, the maximum sentence under the GSR for the convictions on the
four substantive offenses in I528 (with those sentences being
concurrent to each other), and then made the maximum sentence
consecutive to the minimum sentence.  On its face, this mixture of
leniency and stringency is unusual, and the reasons for these
choices are not entirely clear.  This observation is not a
criticism.  The court faced a particularly difficult sentencing
problem because the closely related cases were prosecuted and
sentenced in separate proceedings, requiring the court to treat

---

[34]In <u>Antonakopoulos</u>, we stated, "[t]he argument that a <u>Booker</u>
error occurred is preserved if the defendant below argued <u>Apprendi</u>
or <u>Blakely</u> error or that the Guidelines were unconstitutional."
399 F.3d at 76.

Fornia's cases as simultaneously related, yet separate, for purposes of sentencing within the confines of a mandatory Guidelines regime.

Indeed, the court appears to have been mindful of the desirability of mitigating the consequences of the government's decision to bring successive prosecutions against Fornia in its subtraction of 21 kilograms of cocaine from the total quantity involved in the offenses in I528 because that portion had already been "the subject of the . . . sentence in [I96]." The Guidelines encourage such attention to the potential unfairness of duplicative punishment resulting solely from prosecutorial charging decisions. For example, U.S.S.G. § 5G1.3, under which Fornia was sentenced to a consecutive term of imprisonment in I528, "was designed 'to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence.'" United States v. Caraballo, 200 F.3d 20, 27 (1st Cir. 1999) (quoting Witte v. United States, 515 U.S. 389, 404-05 (1995)). To that end, subsection (c) contains a policy statement favoring the "achiev[ement of] a reasonable punishment" even where a sentencing court retains the discretion to impose a wholly concurrent, partially concurrent, or wholly consecutive sentence.

We deem it unnecessary and inadvisable to discuss Fornia's many claims of Guidelines sentencing error further; suffice it to say that we cannot conclude beyond a reasonable doubt

-45-

that the court would have resolved the many interrelated sentencing issues it faced in precisely the same manner by "impos[ing] the same sentence in the absence of mandatory Guidelines." <u>Vázquez-Rivera</u>, 2005 WL 1163672, at *10, ___ F.3d at ___. We are particularly reluctant to make presumptions in the face of such a severe total punishment, a sentence of nearly 48 years -- virtually a life sentence. We therefore conclude that both cases should be remanded for resentencing under <u>Booker</u>. However, our decision to remand for resentencing should not be read as a "suggestion or a prediction that [Fornia's] sentence[s] will necessarily be altered." <u>United States</u> v. <u>Heldeman</u>, 402 F.3d 220, 224 (1st Cir. 2005).

## V.

Fornia's convictions are **<u>affirmed</u>**; his sentences on those convictions are **<u>vacated</u>**. We **<u>remand</u>** for resentencing consistent with this opinion.

**<u>So ordered</u>**.